**COMMONWEALTH of Pennsylvania, Appellant,**

**v.**

**Maurice Devaughn CLINTON, Appellee.**

Superior Court of Pennsylvania.

Submitted Jan. 3, 2006.

Filed Aug. 15, 2006.

Reargument Denied Sept. 25, 2006.

Michael W. Streily, Deputy Dist. Atty., Pittsburgh, for Com., appellant.

Norman Chase and James A. Wymard, Pittsburgh, for appellee.

BEFORE: TODD, McCAFFERY, and JOHNSON, JJ.

OPINION BY McCAFFERY, J.:

¶ 1 The Commonwealth of Pennsylvania appeals from the order of the Court of Common Pleas of Allegheny County that suppressed evidence seized from Appellee, Maurice Devaughn Clinton, following a traffic stop and subsequent arrest. Specifically, the Commonwealth asks us to determine whether the court below erred in suppressing evidence discovered after Appellee answered a police officer's question, posed during a routine traffic stop, as to whether Appellee had any weapons in his vehicle. Upon review, we reverse and remand for trial.

¶ 2 The suppression court found the following facts, based upon testimony presented by the Commonwealth at the suppression hearing:

City of Pittsburgh police detective Scott Love testified that at about half past midnight on December 30, 2004, he was working undercover with two fellow narcotics officers in the East Hills neighborhood of Pittsburgh. The officers were driving in an unmarked vehicle when they observed [Appellee's] car fail to stop at an intersection stop sign. The officers activated their emergency lights and sirens, followed [Appellee] into an apartment parking lot, parked 'right behind him' and approached [Appellee], who was alone in the car. Detective Love and one of his partners approached [Appellee] at the driver's side of his car, while the third officer approached the passenger side of the car. Detective Love asked [Appellee] for a valid driver's license, which he provided. Detective Love next asked for registration and insurance information and observed [Appellee] 'reaching around trying to go to the glove box.' At that point, Detective Love asked [Appellee] whether 'he had any weapons ... or anything [the police] should be aware of.' [Appellee] responded that he had 'a little bit of weed.' This statement regarding marijuana led to [Appellee's] arrest and the subsequent search of his person and car. City of Pittsburgh narcotics detective Edward Fallert testified and concurred with Detective Love that [Appellee] ran the stop sign, was approached by the two officers on the driver's side and Detective Fallert on the passenger side

of his car. Detective Fallert heard Detective Love ask [Appellee] whether he had any weapon on him or anything that he should be concerned about. Detective Fallert described [Appellee] as 'very cooperative.'

(Suppression Court Opinion, dated August 15, 2005, at 1–2; citations to Notes of Testimony ("N.T.") omitted).

¶ 3 Detective Love also testified that when Appellee stated that he possessed "a little bit of weed," the detective asked Appellee to step out of the vehicle and inquired about the location of the marijuana. Appellee pulled a small knotted baggy containing marijuana from a pocket. At that point, Detective Love placed Appellee under arrest and conducted a search incident thereto which yielded a black tangent digital scale from a sweatshirt pocket, in addition to $332 in cash and a cell phone. (N.T., 5/19/05, at 8–9).

¶ 4 Detective Fallert also testified that either he or Detective Snyder, who was also at the scene, asked Appellee if he had anything else in the vehicle. Appellee responded no, and added that the police could check for themselves. Detective Fallert testified that Appellee was asked whether the police could search his vehicle, and that Appellee did not refuse this request and was, indeed, "very cooperative" throughout. (*Id.* at 40–41). A search of the main part of the vehicle yielded no evidence. A search of the trunk, however, yielded a one-pound bag of marijuana. (*Id.* at 43–44).

¶ 5 After Detectives Love and Fallert testified at the suppression hearing, the Commonwealth rested and Appellee moved to suppress the evidence seized during his arrest. Following argument, the suppression court granted Appellee's motion. The court concluded that while the initial traffic stop was valid, the detectives acted towards Appellee in a manner that was "inherently coercive," with the aim of eliciting "incriminating evidence without having advised Appellee of his rights against self-incrimination." (Suppression Court Opinion at 2). The court determined that the circumstances creating a "coercive" atmosphere at the scene consisted of police parking their vehicle behind Appellee's vehicle in the parking lot, and the three detectives positioning themselves at the driver's window and the passenger-side window. The court concluded that Appellee was thus "surrounded," making Detective Love's question to Appellee regarding whether he "had any weapons or anything he should be concerned about" an "improper" one. The court determined that, under the circumstances, "Detective Love's questioning was inherently coercive and heavy-handed." (*Id.* at 3). For these reasons, the trial court suppressed the evidence seized during Appellee's arrest.

¶ 6 The Commonwealth filed a timely appeal in which it asks that we review the following question:

Whether the trial court erred in granting the motion to suppress?

(Commonwealth's Brief at 4).

¶ 7 Our review of the Commonwealth's question is informed by the following principles:

When the Commonwealth appeals from a suppression order, we follow a clearly defined standard of review and consider only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted. The suppression court's findings of fact bind an appellate court if the record supports those findings. The suppression court's conclusions of law, however, are not binding on an appellate court, whose duty is to determine if the

suppression court properly applied the law to the facts.

*Commonwealth v. Boulware,* 876 A.2d 440, 442 (Pa.Super.2005) (citations omitted). Here, Appellee did not present any evidence, and the Commonwealth's evidence was uncontradicted.

¶ 8 The Commonwealth argues that the suppression court erred by (1) ignoring the dangers to police inherent in any traffic stop; and (2) concluding that Detective Love's question regarding the presence of weapons or anything else of concern, was improper or coercive under the circumstances. The Commonwealth posits that a police officer's question to a detainee during a traffic stop regarding the presence of weapons or other concerns would not typically prompt an incriminating response. For example, properly licensed handguns in a vehicle are not illegal, nor are knives, hammers, wrenches, screwdrivers, ice picks, or other potentially harmful tools. We agree.

¶ 9 There are three levels of recognized interactions between the police and the citizenry:

> The first [level of interaction] is the 'mere encounter' (or request for information) which need not be supported by any level of suspicion, but carries no official compulsion to stop or respond. The second, an 'investigative detention' must be supported by reasonable suspicion; it subjects a suspect to a stop and period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of arrest. Finally, an arrest or 'custodial detention' must be supported by probable cause.

*Commonwealth v. Stevenson,* 894 A.2d 759, 770 (Pa.Super.2006) (citation omitted).

¶ 10 It is well established that a forcible stop of a motor vehicle by the police constitutes a second-level seizure, or "investigative detention," triggering the constitutional protections of the Fourth Amendment. *Commonwealth v. Campbell,* 862 A.2d 659, 663 (Pa.Super.2004), *appeal denied,* 584 Pa. 699, 882 A.2d 1004 (2005). A police officer has the authority to stop a motor vehicle for further investigation of a Vehicle Code violation that he or she had observed. *Id.* During the traffic stop, the police officer may check "vehicle registration, proof of financial responsibility, vehicle identification number or engine number or the driver's license, or secure such other information as the officer may reasonably believe necessary to enforce the provisions of [the Vehicle Code]." 75 Pa. C.S.A. § 6308(b).

¶ 11 Closely related to the issue before us is the additional authority possessed by the police to request that the driver and any passengers step out of a vehicle which is the subject of a traffic stop "as a matter of course," regardless of whether the police have a reasonable suspicion that criminal activity is afoot. *Campbell, supra,* 862 A.2d at 663–64. As the United States Supreme Court determined, the concern for *officer safety,* which is a legitimate basis for police requests to occupants to alight from stopped vehicles, outweighs the *minor intrusion* on the drivers and passengers whose freedom of movement had already been curtailed by the traffic stop. *Maryland v. Wilson,* 519 U.S. 408, 414–15, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997). Further, it has long been recognized that individuals have a diminished expectation of privacy while in vehicles. *Campbell, supra,* 862 A.2d at 664 n. 4.

¶ 12 The issue of officer safety should not be lightly regarded. Long ago, the United States Supreme Court recognized the issue of officer safety as a significant component in determining how to strike the proper balance between the rights of citizens to be free from unreasonable

searches and seizures, and protecting the safety of our citizens and police officers:

> We are now concerned with more than the governmental interest in investigating crime; in addition, there is the more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him. Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties. American criminals have a long tradition of armed violence, and every year in this country many law enforcement officers are killed in the line of duty, and thousands more are wounded. Virtually all of these deaths and a substantial portion of the injuries are inflicted with guns and knives.
>
> *In view of these facts, we cannot blind ourselves to the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest.*

*Terry v. Ohio,* 392 U.S. 1, 23–24, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (footnote omitted) (emphasis added). Our Supreme Court has long recognized this interest as well. *See Commonwealth v. Hicks,* 434 Pa. 153, 158–159, 253 A.2d 276, 279 (1969) (adopting the *Terry* test and reasoning). Officers must be concerned with their safety at all times, and particularly at a time when the occupant of a vehicle is reaching into an *unexposed* area of the vehicle which may contain a weapon.

¶ 13 In the case *sub judice,* Detective Love, during an investigatory traffic stop, asked Appellee if there were any weapons or anything else the officer should know about prior to Appellee rooting through the vehicle's glove compartment in search of registration and insurance information. Under the principles outlined above, there can be no doubt that the balance between officer safety and the minute intrusion upon a citizen's rights which such a question represents during a *Terry* stop, falls **unquestionably and completely on the side of officer safety.** Simply by analogy, a question by police regarding the existence of weapons is clearly less intrusive than a request by police to exit the vehicle. Thus, we determine that it was error for the suppression court to conclude that a police officer's question, posed during a traffic stop prior to permitting a driver to search the vehicle's closed compartments presumably, but not necessarily, for papers, was "coercive" simply because its subject was the existence of weapons or anything else of which the police had a legitimate reason to be aware.

¶ 14 Moreover, we agree with the Commonwealth that Detective Love's question is not of the type that would typically elicit incriminating statements. Many objects that can be used as weapons may be lawfully carried by citizens in vehicles, and thus a citizen's disclosure of the existence of these objects would not be incriminating. Also, we do not conclude that Detective Love's question regarding "anything else he should be aware of," in the context of a direct question concerning the existence of weapons, could only, principally, or normally be interpreted as an invitation for a criminal to confess his or her crimes. We return to the analogy of the police request that a driver or passenger alight from a stopped vehicle. A request to alight from a vehicle is clearly permitted, even though this act may result in the police detecting incriminating evidence. A driver or passenger might alight from a vehicle and display the suspicious bulge of a concealed handgun, or contraband may fall to the ground in plain view while the person exits the vehicle. The intoxicated

driver might stagger upon getting out of a vehicle. Detective Love's question to Appellee was no more intrusive and no more of a nature that would tend to yield incriminating evidence than an unquestionably permissible request to alight from a vehicle during a traffic stop.[1]

¶ 15 The trial court also determined that Detective Love's question, together with the fact that Appellee's vehicle was blocked by the police car and that officers were at both the driver's and the passenger-side windows, indicated that the traffic stop had advanced in nature to that of a custodial detention, and that, consequently, Detective Love's question to Appellee constituted a custodial interrogation. We cannot agree.

¶ 16 A police encounter becomes an arrest when, under the totality of the circumstances, the detention becomes so coercive that it is the functional equivalent of an arrest. The numerous factors used to determine whether a detention has evolved into an arrest include the cause for the detention, the detention's length, the detention's location, whether the suspect was transported against his or her will, whether physical restraints were used, whether the police used or threatened force, and the character of the investigative methods used to confirm or dispel the suspicions of the police. *Stevenson, supra,* 894 A.2d at 770. Custodial interrogation has been defined as questioning initiated by the police after a person has been taken into custody or otherwise deprived of his or her freedom of action in any significant way. *Commonwealth v. Ingram,* 814 A.2d 264, 271 (Pa.Super.2002). Further, an "in-

terrogation" occurs when the police *"should know that their words or actions are reasonably likely to elicit an incriminating response from the suspect." Id.* (Emphasis added). *Miranda* warnings must precede a custodial interrogation. *Miranda v. Arizona,* 384 U.S. 436, 444, 478–79, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *Ingram, supra.*

¶ 17 Recently, our Supreme Court held that an investigative detention, but *not* a custodial detention, occurs when (1) a police officer stops a pedestrian fitting the description of a suspect to a shooting; (2) asks the pedestrian whether he has any weapons, drugs, or needles; (3) tells the pedestrian that, for the safety of both the officer and pedestrian, he will perform a pat down to ensure that the pedestrian has no weapons; and (4) asks a "moderate number of questions" about the shooting. *Commonwealth v. Pakacki,* —— Pa. ——, 901 A.2d 983, 988 (2006). During the investigatory stop in *Pakacki,* the officer frisked the pedestrian, detected the odor of marijuana about the pedestrian, and felt an object in the pedestrian's pocket that the officer, based upon his professional experience, suspected was a marijuana pipe. The officer asked the pedestrian what the object was, to which the pedestrian replied: "[I]t is a pipe." *Id.,* at 985. The pedestrian was then placed under arrest.

¶ 18 The Court held:

The detention to which appellee [the pedestrian] was subjected was not so coercive as to constitute the functional equivalent of an arrest.

---

**1.** We have also held that a police officer, for purposes of officer safety and health, may preface a *Terry* search of a suspected intravenous drug user by asking if the detainee has any needles in his or her possession, so that the officer can avoid being stuck. *Common-*

*wealth v. Kondash,* 808 A.2d 943 (Pa.Super.2002). Detective Love's question to Appellee was less intrusive and less likely to yield incriminating evidence than the question permitted the police by *Kondash.*

\* \* \* \*

Here, [the arresting officer] had information that appellee may have been involved in a shooting, and when he stopped appellee, he understandably stated that he was going to frisk him for weapons as a safety measure. This interaction was the classic scenario contemplated by *Terry* [, *supra*,] and did not constitute custody; after the frisk and a 'moderate number of questions' about the shooting, appellee would have been free to leave, had the trooper not smelled marijuana and felt the pipe. This was not the functional equivalent of an arrest.... Thus, we hold appellee was not in custody so as to require *Miranda* warnings before the officer asked him about the object in his pocket.

*Id.*, at 988 (citations, quotation, and footnotes omitted).

¶ 19 The Court further determined that because the pedestrian had ***not*** been in custody during the above-described encounter with the police officer, there was no reason to address the issue of whether the officer's question concerning the nature of the object in pedestrian's pocket constituted an interrogation. *Id.*, at 988 n. 6.

¶ 20 Similarly, in the case *sub judice*, Appellee was not in custodial detention or subject to custodial interrogation at the time he made his incriminating statement. The cause for Appellee's detention was a traffic stop after the police observed Appellee commit a traffic violation. The investigatory traffic stop had not yet concluded when Appellee made his incriminating statement; indeed, Appellee had not yet even produced the requested registration and insurance information. Appellee's detention had, therefore, been relatively brief at the time he made his statement. The location of the detention was in an apartment building parking lot off a public roadway. Appellee had not been transported against his will at the time he made his incriminating statement. Appellee had not been physically restrained. The police did not threaten force. Finally, Detective Love's question was not threatening, demanding, onerous, devious, or characterized by trickery. The question was plain, even-tempered, and to the point. Moreover, as we determined above, Detective Love's question was not one reasonably likely to elicit an incriminating response from Appellee, and thus the question ***did not constitute an interrogation at all.*** Even though Appellee's vehicle was blocked by a police car, there was no reason to conclude that Appellee could not have simply walked away or asked the police to move their vehicle at the conclusion of the investigatory stop had Appellee not volunteered his incriminating statement. Finally, it cannot be denied that the restrictive nature of Appellee's encounter with the police ***paled*** in comparison to the restrictive nature of the encounter between the pedestrian and police officer that our Supreme Court determined was not a custodial detention in *Pakacki, supra.*

¶ 21 Accordingly, we determine that Appellee was not in custodial detention at the time of Detective Love's question; Detective Love's question did not constitute an interrogation; and *Miranda* warnings were thus not required prior to Detective Love's question. In fact, had Appellee not made his incriminating statement, there is nothing in the record that would indicate that the traffic stop would not have ended shortly after it began, with the issuance of a citation or warning and with Appellee then being free to continue on his way.

¶ 22 For all of the above reasons, and based upon our review and analysis of the instant facts and relevant law, we hold that the suppression court erred by concluding that Appellee had been deprived of his constitutional rights prior to making his incriminating statement, necessitating the suppression of evidence. Accordingly, we reverse the order suppressing the evidence seized by the police, and remand for trial.

¶ 23 Order reversed. Case remanded. Jurisdiction relinquished.

¶ 24 JOHNSON, J. files a Dissenting Opinion.

## DISSENTING OPINION BY JOHNSON, J.:

¶ 1 I respectfully dissent. In this case the Majority determines that the trial court erred in suppressing contraband seized from the defendant after questioning during a stop by Pittsburgh police detectives prompted the defendant's incriminating response and consequent discovery of "a little bit of weed." Unlike the trial judge, the Majority concludes that Clinton "was not in custodial detention at the time of [the detective's] question; [the detective's] question did not constitute an interrogation; and *Miranda* warnings were thus not required[.]" Majority Op. at 1033. I disagree with the Majority's conclusion and would affirm the trial court's order as entered. Given the coercive scenario on display from the commencement of this encounter, I can only conclude that the defendant was subject to custodial interrogation and was entitled to be warned of his rights. The failure of police detectives to administer the appropriate warnings properly compels suppression.

¶ 2 A citizen is subject to "custodial interrogation" if he is "physically deprived of his freedom in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by such interrogation." *Commonwealth v. Turner,* 772 A.2d 970, 973 (Pa.Super.2001) (*en banc* ) (citing *Commonwealth v. Chacko,* 500 Pa. 571, 459 A.2d 311, 314 (1983)). "The standard for determining whether police have initiated a custodial interrogation or an arrest is an objective one, *with due consideration given to the reasonable impression conveyed to the person interrogated rather than the strictly subjective view of the troopers or the person being seized.*" *Turner,* 772 A.2d at 973 (quoting *Commonwealth v. Edmiston,* 535 Pa. 210, 634 A.2d 1078, 1085–86 (1993)) (emphasis added). Thus, to determine whether custodial interrogation has occurred, we consider, first, the totality of the circumstances to determine whether police presence and conduct at the scene of the detention became so coercive as to become the functional equivalent of an arrest, and second whether the questions the police posed were such as to elicit an incriminating response. *See Turner,* 772 A.2d at 973–74. An ordinary traffic stop does not rise to that level so long as it remains consistent with the driver's statutory obligation to remain at the scene and provide information relevant to the reason for which he was stopped and does not involve restraints associated with arrest. *See id.* at 978–79 (Lally–Green, Kelly, Johnson, Joyce, and Musmanno, JJ., concurring) (citing *Commonwealth v. Gonzalez,* 519 Pa. 116, 546 A.2d 26 (1988)). Should the circumstances of the traffic stop exceed that scope, inducing the driver "to speak where he would not otherwise do so freely," the officer's question may constitute a custodial interrogation and impose upon him a duty to administer *Miranda* warnings. *See Turner,* 772 A.2d at 977–78 (Lally–Green, Kelly, Johnson, Joyce, and Musmanno, JJ., concurring) (quoting *Berkemer v. McCarty,* 468 U.S.

420, 439–40, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984)); *see also Commonwealth v. Rosario,* 438 Pa.Super. 241, 652 A.2d 354, 365 (1994) (*en banc* ).

¶ 3 Although these precepts may, in some cases, compel a fine line of distinction, that line is evident here and, in my opinion, the detectives crossed it. Although the Majority appears to discount the circumstances prevailing at the commencement of the stop, when police officers surrounded the defendant's vehicle and effectively immobilized it, I cannot. As Judge Allen recognized, police conduct during the stop was "inherently coercive and heavy-handed," as officers first positioned their vehicle behind the defendant's car and then approached on foot from both sides while the other end of the defendant's car faced a parking barrier. N.T. Suppression Hearing, 5/19/05, at 14–16. The police thus rendered it impossible for the defendant to leave the scene unless he chose to assault one of the officers or ram their vehicle. N.T. Suppression Hearing, 5/19/05, at 20. Although the initial character of the stop (for a traffic violation) imposed a duty on the defendant to remain and respond to questions material to the defendant's status as the driver (i.e., concerning his license), the questioning officer, Detective Love, did not so limit the scope of his questions, but queried the defendant if he had "any weapons or anything [the police] should be aware of." N.T. Suppression Hearing, 5/19/05, at 19.

¶ 4 I find this question and the circumstance of its use more than coincidental. The stop was late at night, and although the defendant was alone, three officers, Detective Love, Detective Fallert, and Sergeant Snyder, all approached the car, taking up positions on either side of it. N.T. Suppression Hearing, 5/19/05, at 37–38. Although the police stopped the defendant for running a stop sign, they were not members of a traffic detail, but were narcotics officers patrolling a public housing project. N.T. Suppression Hearing, 5/19/05, at 4. Consistent with that assignment, they dressed in plain clothes and drove an unmarked car, offering ample suggestion to any driver they stopped that the matter of concern was substantially greater than a traffic violation. Detective Fallert's decision to position himself at the passenger side of the car expressly to prevent the defendant's escape, N.T. Suppression Hearing, 5/19/05, at 28 ("I was just blocking the occupant of the vehicle through the other side of the vehicle."), could only reinforce such an inference. Moreover, evidence suggests that the officers shined flashlights into the darkened car as they approached. Giving "due consideration ... to the reasonable impression conveyed to the person interrogated," the specter of one's car surrounded by three drug enforcement officers, late at night, for a mere traffic violation, is daunting indeed. I need not invoke a flight of fancy to conclude that such circumstances would prompt many drivers "to speak where [they] would not otherwise do so freely." *See Turner,* 772 A.2d at 977 (Lally–Green, Kelly, Johnson, Joyce and Musmanno, JJ., concurring) (quoting *Berkemer,* 468 U.S. 420, 437–39, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984)).

¶ 5 Compounding matters, Detective Love's decision to question whether the lone driver had "anything [they] should be aware of," is more than reasonably suggestive that the officers sought and expected an admission of drug possession. The circumstances under which the detective pursued his questions strengthens that inference, sustaining a conclusion that the officers did conduct an interrogation, and attempted to elicit an incriminating response notwithstanding the absence of reason to do so. *See Turner,* 772 A.2d at 973 ("Interrogation is police conduct calcu-

lated to, expected to[,] or likely to evoke admission."). In point of fact, the defendant was courteous throughout the encounter and gave the officers no articulable reason to suspect that he might have weapons or any form of contraband. N.T. Suppression Hearing, 5/19/05, at 41, 42, 45. Indeed, the officers did not become aware of unlawful conduct outside the traffic violation until after the defendant had produced a valid driver's license, arguably satisfying his statutory obligation to remain. N.T. Suppression Hearing, 5/19/05, at 18, 26. As the defendant then began to reach for his remaining documentation in the glove box (a place where so many drivers keep it, N.T. Suppression Hearing, 5/19/05, at 18), Detective Love posed the question at issue here. Although at the suppression hearing, the detective contended that he would have posed that question to any driver at any stop, N.T. Suppression Hearing, 5/19/05, at 17, the trial court found that assertion dubious, N.T. Suppression Hearing, 5/19/05, at 54, and so do I.

¶ 6 That issue aside, however, the fact remains, as Judge Allen astutely recognized, that "[t]hat question in and of itself does require an incriminating answer unless, of course, the Defendant is going to say something dishonest ...." N.T. Suppression Hearing, 5/19/05, at 54. What's more, regardless of any concern for officer safety, Detective Love posed an open-ended question that inquired not only after weapons, but after contraband as well. Certainly, lawful substances do not fall into the category of things the police "should be aware of." Hence, I can only conclude that the circumstances under which the defendant gave the incriminating answer that prompted his formal arrest constituted custodial interrogation. As such, he was entitled to *Miranda* warnings, and I would affirm the trial court's disposition so finding. Because the Majority declines this course, I must respectfully dissent.