J-A02003-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| DOMINIQUE PERRY | |
| Appellant | No. 3140 EDA 2015 |

Appeal from the Judgment of Sentence September 10, 2015
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0010803-2014

BEFORE: OTT, J., RANSOM, J., and FITZGERALD, J.[*]

MEMORANDUM BY OTT, J.: **FILED MARCH 20, 2017**

Dominique Perry appeals from the judgment of sentence imposed on September 10, 2015, in the Philadelphia County Court of Common Pleas. The trial court sentenced Perry to an aggregate term of 11½ to 23 months' imprisonment, followed by two years' probation, after he was found guilty of carrying a firearm without a license, carrying a firearm on public streets, and possession of a small amount of marijuana.[1] On appeal, Perry argues the trial court erred in denying his pretrial motion to suppress physical evidence and a statement. For the reasons below, we affirm.

---

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 6106(a)(1) and 6108, and 35 P.S. § 780-113(a)(31), respectively.

The facts underlying Perry's arrest, as developed during the suppression hearing, are summarized by the trial court as follows:

> Philadelphia Police Officer Sergeant Daniel Ayres, assigned to the 19th District, testified that on September 7, 2014 at approximately 1:00 a.m. in the area of Washington Lane and Mansfield Avenue in … Philadelphia, he observed a Kia K900 bearing a Maryland tag … traveling eastbound on Washington Lane. Officer Ayres testified that the vehicle in question disregarded the red signal at Mansfield Avenue. In response, Officer Ayres immediately activated his lights and sirens, pulled the vehicle over, and conducted a vehicle investigation on the 1600 block of Washington Lane. The vehicle in question was operated by [Perry] with no passengers present.
>
> Officer Ayres testified that the vehicle pulled over right away. Officer Ayres then approached the vehicle and asked [Perry] for his license, registration, and proof of insurance. Officer Ayres testified that [Perry] was extremely nervous as he was gathering his paperwork. Specifically, Officer Ayres stated that he observed [Perry's] arms shaking. Officer Ayres stated that during this time he observed a license to carry a firearm in [Perry's] possession as [Perry] was going through his paperwork in the vehicle. At this particular time Officer Ayres asked [Perry], "Do you have any weapons on you?" Officer Ayres stated that [Perry] hesitated for a brief three (3) to five (5) seconds before responding, "No." Officer Ayres testified that based on [Perry's] extreme nervousness in addition to the hesitation when he asked [Perry] about the firearm and the permit to carry, Officer Ayres ordered [Perry] to exit his vehicle in order to conduct a frisk for weapons on [Perry's] person.
>
> Officer Ayres testified that [Perry] complied and stepped out of his vehicle. Officer Ayres then asked [Perry] to place his hands on the vehicle. Officer Ayres stated that as he was about to frisk and pat down [Perry] to check for weapons on his person, [Perry] disclosed that he had a gun in the center console. Officer Ayres then immediately secured [Perry] and detained him in the back of his patrol vehicle and explained to the court, "I was by myself." Officer Ayres thereafter went back to the center console of [Perry's] vehicle where he discovered a … nine-millimeter [handgun] loaded with 18 live rounds.

Additionally, Officer Ayres testified that there was a clear glass jar in the center console which contained a clear sandwich bag with a loose amount of marijuana. Officer Ayres removed both the firearm and marijuana from the vehicle. [The officer then] returned to his vehicle and conducted a search of [Perry's] license to carry a firearm on his computer in his vehicle. [Perry's] license to carry … came back as expired as of November 5, 2013 almost a year prior.

Officer Ayres testified that [Perry] was placed into custody for the possession of the firearm and the narcotics. A further search of [Perry's] vehicle was conducted in which five (5) clear, glass jars with white lids of alleged marijuana inside were discovered in the backseat of the car. All evidence was placed on Philadelphia property receipts. Officer Ayres testified that he was in full uniform and in a marked vehicle during the commission of the traffic stop.

Officer Ayres testified again that [Perry] stated that he had a gun in the center console of the vehicle right before he was pat[ted] down by the officer. Officer Ayres stated that he had asked [Perry] if he had any weapons on him as the officer took [Perry] out of the vehicle. Officer Ayres explained that he was right next to [Perry] as he was stepping out of the vehicle.

* * * *

On cross-examination, Officer Ayres testified that other officers came to assist him but could not recall the exact time. Officer Ayres stated that he believed that other officers arrived after the recovery of the firearm as he recalled that [Perry] was in handcuffs in a police vehicle. Officer Ayers repeated that [Perry] ran a red light and pulled over on his command during the traffic stop. Officer Ayres stated that he approached on the driver side, asked [Perry] for his paperwork, and at that point did not see any contraband. …

Officer Ayres testified that he then noticed [Perry's] license to carry as [Perry] was going through his paperwork and based on that he asked if [Perry] had a firearm on him. Officer Ayres stated that [Perry] paused for three to five (3-5) seconds and then turned around and said no. Officer Ayres then asked [Perry] to step out of the vehicle and decided to do a frisk of [Perry] to make sure he did not have a weapon on him. Officer Ayres stated:

- 3 -

"I don't believe I actually had a chance to start patting him down. When I was asking him – as he's coming out, Are you sure you don't have any weapons on you, I might have been telling him, your (sic) shaking, your arms are shaking. Then that's when he said, it's a gun in the car."

Officer Ayres further explained his reasoning for the pat down:

"The reason I was patting him down is because I was conducting a traffic stop. I wanted to make sure he wasn't armed while we were having – while we were standing there during the traffic stop because he had a permit to carry. And he was extremely nervous."

Officer Ayres stated that he informed [Perry] that he was going to conduct a frisk for weapons. At the moment that Officer Ayres was about to pat [Perry] down, [Perry] stated "there's a gun in the center console." …

On redirect examination, Officer Ayres testified that he never actually frisked [Perry]. Officer Ayres stated that once [Perry] stated that there was a gun in the center console he secured [Perry]. Officer Ayres explained that he was by himself at that time. As such, he secured [Perry] quickly and placed him in the police vehicle so he could "recover that gun."

[Perry] testified that on September 7, 2014 at approximately 1:00 a.m. he was on his way home from work driving a Kia. [Perry] stated that he worked at Avis at the Philadelphia International Airport, a rental car company. [Perry] affirmed that he had a gun in the center console and at some point he had a license to carry a firearm. [Perry] explained that he had a license to carry for protection because he transports money and paperwork for the company back and forth [to] different locations late at night. [Perry] stated that he had his license to carry and when he was ordered to step out of the vehicle, he placed it in a cup holder. [Perry] could not recall if the officer patted him down. [Perry] stated that the officer then at some point searched [Perry's] car and recovered a firearm and marijuana.

On cross-examination, [Perry] testified that the officer searched the vehicle **before** [Perry] stated that he had a firearm in the center console. [Perry] affirmed that the officer asked him for his license and registration and then asked if [Perry] had any weapons on him. [Perry] affirmed that he initially stated no

to the officer. He then affirmed that he was asked to step out of the vehicle and asked again if he had any weapons on him. [Perry] asserted that Officer Ayres began to search the vehicle while [Perry] was outside of the car. He could not recall if he was handcuffed. When asked if he said anything to the officer, [Perry] replied, "Not Really." He stated there was a gun [and] marijuana in the center console but could not recall if there was marijuana in the back seat. [Perry] acknowledged that his license to carry was expired.

On redirect, [Perry] furthermore testified that other officers arrived on the scene[] before any firearm or narcotic was recovered. [Perry] testified that Officer Ayres began and initiated his search while [Perry] was standing outside of his vehicle. When asked if he was handcuffed, [Perry] stated he could not recall. [Perry] stated that the arriving officers "hopped out of the vehicle" but could not recall what the other officers were doing.

Trial Court Opinion, 6/17/2016, at 2-7 (record citations and footnote omitted; emphasis supplied).

Perry was subsequently charged with carrying a firearm without a license, carrying a firearm on public streets, and possession of a small amount of marijuana. On October 14, 2014, he filed a pretrial motion to suppress both the evidence recovered from his vehicle and his statement to Officer Ayres. Following a suppression hearing on April 6, 2015, the trial court initially granted Perry's motion. The Commonwealth then filed a timely motion for reconsideration, which the court granted. Following a second hearing on June 3, 2015, the trial court denied Perry's motion to suppress.

The case proceeded to a non-jury trial on June 25, 2015, at which time the parties incorporated the testimony from the suppression hearing. The trial court found Perry guilty of all charges. On September 10, 2015, Perry

was sentenced to a term of 11½ to 23 months' imprisonment followed by two years' probation on the charge of carrying a firearm without a license, and a concurrent term of one-year probation on the charge of carrying a firearm on public streets. No further penalty was imposed on the drug charge. This timely appeal followed.[2]

Perry raises two issues on appeal, both of which challenge the trial court's ruling denying his pretrial suppression motion. Our standard of review is well-settled:

> [An appellate court's] standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, [the appellate court] is bound by [those] findings and may reverse only if the court's legal conclusions are erroneous. Where ... the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to [ ] plenary review.

---

[2] Although the trial court did not direct Perry to file concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b), Perry, nevertheless, filed a concise statement on October 27, 2015, and an amended concise statement on December 29, 2015.

*Commonwealth v. Mason*, 130 A.3d 148, 151–152 (Pa. Super. 2015), *appeal denied*, 138 A.3d 3 (Pa. 2016).

In his first issue, Perry contends the trial court erred in denying his motion to suppress both his statement to Officer Ayres and the evidence recovered from his vehicle because the officer subjected him to an unlawful frisk. *See* Perry's Brief at 10. Perry concedes "he was lawfully stopped for a Motor Vehicle Code violation and that [Officer] Ayres was permitted … to ask [him] to step out of his vehicle." *Id.*, *citing* **Pennsylvania v. Mimms**, 434 U.S. 106 (1977).[3] However, he argues that because Officer Ayers had no reasonable basis to believe he was armed and dangerous, the officer had no right to frisk him, and the statement he made during "the unlawful frisk process" should have been suppressed. Perry's Brief at 10.

It is well-settled that a "forcible stop of a motor vehicle by the police constitutes a second-level seizure, or 'investigative detention,' triggering the constitutional protections of the Fourth Amendment." **Commonwealth v. Clinton**, 905 A.2d 1026, 1030 (Pa. Super. 2006) (quotation omitted), *appeal denied*, 934 A.2d 71 (Pa. 2007). As noted above, during a routine traffic stop, a police officer may order the driver out of the vehicle for the

_____

[3] Indeed, "an officer conducting a valid traffic stop may order the occupants of a vehicle to alight to assure his own safety." **Commonwealth v. Reppert**, 814 A.2d 1196, 1202 (Pa. Super. 2002) (*en banc*) (citations omitted).

officer's safety. **See Reppert**, **supra**. However, before the officer may frisk

a driver, the Fourth Amendment requires another level of protection.

> "If, during the course of a valid investigatory stop, an officer observes unusual and suspicious conduct on the part of the individual which leads him to reasonably believe that the suspect may be armed and dangerous, the officer may conduct a pat-down of the suspect's outer garments for weapons." **Commonwealth v. E.M./Hall**, 558 Pa. 16, 735 A.2d 654, 659 (1999). In order to establish reasonable suspicion, the police officer must articulate specific facts from which he could reasonably infer that the individual was armed and dangerous. **See Commonwealth v. Gray**, 896 A.2d 601, 606 (Pa. Super. 2006). When assessing the validity of a **Terry**[4] stop, we examine the totality of the circumstances, **see id.**, giving due consideration to the reasonable inferences that the officer can draw from the facts in light of his experience, while disregarding any unparticularized suspicion or hunch. **See Commonwealth v. Zhahir**, 561 Pa. 545, 751 A.2d 1153, 1158 (2000).

**Commonwealth v. Wilson**, 927 A.2d 279, 284 (Pa. Super. 2007).

Here, the trial court found Officer Ayres possessed the requisite

reasonable suspicion that Perry might be armed and dangerous. The court

opined:

> Officer Ayres not only observed visible, extreme nervousness from [Perry] during the duration of the traffic stop, but furthermore observed other salient factors in warranting reasonable suspicion. Most markedly, Officer Ayres testified that he observed in [Perry's] possession a license to carry a firearm. Officer Ayres testified that he observed the license to carry as [Perry] was going through his paperwork in a clearly distressed, visibly nervous state causing his arms to shake. Given the license to carry and [Perry's] overt behavior, Officer Ayres reasonably asked [Perry] whether or not he had a firearm on him. [Perry] suspiciously paused for three to five (3-5) seconds

---

[4] **Terry v. Ohio**, 392 U.S. 1 (1968).

> before responding no, according to Officer Ayres. Moreover, Officer Ayres was conducting the traffic stop at a late hour around 1:00 a.m. with no partner or back-up for safety or assistance.

Trial Court Opinion, 6/17/2016, at 13-14.

Perry, nevertheless, contends the facts presented during the suppression hearing do not support the court's findings. Rather, he argues the facts in the present case are "remarkably similar" to those in the *en banc* decision, ***Commonwealth v. Cartagena***, 63 A.3d 294 (Pa. Super. 2013) (*en banc*), *appeal denied*, 70 A.3d 808 (Pa. 2013).

In ***Cartagena***, two officers pulled over the defendant's car at 1:50 a.m. because the windows were heavily tinted, a violation of the Motor Vehicle Code. ***Id.*** at 296. Although the defendant did not respond to the officers' initial request to lower his window, he did upon their second request. ***See id.*** One of the officers testified that after he asked the defendant for his license and registration, the defendant "opened his center console, looked inside 'like he was going to retrieve paperwork out of there[,] […] looked stunned and then closed it." ***Id.*** (citation omitted). The officer described the defendant as "'extremely nervous, […] [t]ripping over his words and shaking.'" ***Id.*** (citation omitted). Although the defendant provided the police officers with the requested paperwork, they asked him to step out of the vehicle because of his "nervousness," and conducted a pat-down search which revealed no results. ***Id.*** at 297. However, one of the officers proceeded to conduct a cursory search of the driver's seat and center console, and recovered a firearm. ***See id.***

The defendant, who was charged with several firearms violations, filed a motion to suppress the evidence recovered during the search. The trial court granted the motion. Upon the Commonwealth's appeal, the *en banc* panel concluded that "[b]ased on the evidence of record, … the totality of circumstances, taken together, fall short of reasonable suspicion to conduct the search at issue in this case." ***Id.*** at 304 (footnote omitted). The panel emphasized the only factors supporting the search were: "(1) the stop occurred at night, (2) [the defendant's] windows were tinted, and (3) [the defendant] appeared to be nervous." ***Id.*** The panel opined:

> Without more, the nervousness of a driver of a vehicle during a late night stop for suspected violation of the tinted window prohibition does not suffice to allow police to conduct a ***Terry*** frisk and a protective weapons search of a vehicle. A contrary ruling would serve to essentially eliminate a motor vehicle operator's protection against unreasonable searches and seizures guaranteed by the Fourth Amendment of the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution.
>
> Absent some combination of evidence to give context to the encounter—for example, testimony that the stop occurred in a high-crime area; testimony regarding [the officer's] training and experience and its role in formulating a reasonable suspicion that [the defendant] was armed and dangerous; and/or testimony illuminating the length of the delay in [the defendant] lowering his windows—we cannot overturn the suppression court's decision to suppress the gun found during the search of the passenger compartment of the vehicle. To do so would require an unwarranted expansion of police officers' ability to conduct ***Terry*** frisks and protective vehicle searches, and a concomitant erosion of the rights of citizens of Pennsylvania to be free of unreasonable search and seizure.

*Id*. at 306.  ***Compare with Commonwealth v. Buchert***, 68 A.3d 911 (Pa. Super. 2013), (distinguishing **Cartagena** and finding officer possessed reasonable suspicion to search area within passenger's immediate control when passenger was extremely nervous during late night stop of vehicle for broken tail light, and officer witnessed passenger make furtive movements before approach), *appeal denied*, 83 A.3d 413 (Pa. 2014).

Relying on **Cartagena**, Perry maintains the record in the present case is similarly lacking in evidence supporting a reasonable belief that he may have been armed and dangerous.  **See** Perry's Brief at 16.  To that end, Perry emphasizes that, in the present case, there was: (1) no report of criminal activity; (2) no testimony that he made any furtive movements while in the car; (3) no evidence that the stop occurred in a high crime area; (4) no testimony from Officer Ayres that he was fearful during the stop; and (5) no observation of any weapons or bulges after Perry exited the car "that would cause the [officer] to reasonably disbelieve [Perry] about the presence of a gun."  *Id.* at 14.

However, in underscoring the evidence that was **not** present in the case *sub judice*, Perry fails to acknowledge the key factor that supports Officer Ayres' reasonable suspicion – Perry possessed a license to carry a firearm.  This fact, coupled with the late night stop by an officer acting

alone,[5] Perry's "extreme nervousness," as well as Perry's hesitation when the officer first asked if he had "any weapons" on him, provided Officer Ayres with reasonable suspicion to conduct a *Terry* frisk.[6]  Moreover, it bears emphasis that Perry told Officer Ayres about the firearm in the center console **before** the officer physically began to frisk him.  Unlike in *Cartagena*, where the initial frisk yielded no results but the officers proceeded to search the car anyway, here, Officer Ayres had not yet initiated the frisk when Perry told the officer about the gun.

Accordingly, because we conclude Officer Ayres had reasonable suspicion to believe Perry might be armed and dangerous, we find the officer's initiation of the frisk process was proper.  Therefore, Perry's statement to the officer during that process, in which he acknowledged he had a gun in the center console, was proper and supported the officer's limited search to retrieve the gun.  Consequently, Perry's first issue fails.

In his second issue, Perry argues, alternatively, that the court erred in failing to suppress his statement to Officer Ayres because it was obtained in violation of his *Miranda*[7] rights.  **See** Perry's Brief at 20.  Specifically, he contends Officer Ayres subjected him to a custodial interrogation when,

---

[5] Officer Ayres testified his backup did not arrive until after he had recovered the firearm.  **See** N.T., 4/6/2015 at 13.

[6] N.T., 4/6/2015, at 7.

[7] *Miranda v. Arizona*, 384 U.S. 436 (1966).

during the frisk process, the officer asked him if he had a weapon. ***See id.*** at 22. Perry states:

> In the present case, there can be no question that [Perry] was "deprived of his freedom of action or movement in a significant way" at the time he responded to [Officer] Ayres' second question about the presence of any guns. [Perry] was stopped for a traffic violation. He was directed to step out of his car. He was ordered to place his hands on the car and was in the process of being frisked when he responded to the [officer's] question and told him there was a gun in the center console.

***Id.*** at 21-22. Because he was not provided with his ***Miranda*** warnings prior to the questioning, Perry claims his statement, and the gun recovered as a result thereof, should be suppressed.

Preliminarily, we note the three levels of interaction between the police and citizens are: (1) a mere encounter, (2) an investigative detention, and (3) a custodial detention. ***Clinton***, ***supra***, 905 A.2d at 1030. ***Miranda*** warnings are only required before an officer conducts a custodial interrogation. ***Id.*** at 1032.

> Custodial interrogation has been defined as questioning initiated by the police after a person has been taken into custody or otherwise deprived of his or her freedom of action in any significant way. Further, an "interrogation" occurs when the police "should know that their words or actions are reasonably likely to elicit an incriminating response from the suspect."

***Id.*** (internal citations omitted). Further, as noted *supra*, a vehicle stop generally constitutes an investigative detention, rather than a custodial detention. ***Id.*** at 1030. However, an investigative detention may develop

into a custodial detention when "the detention becomes so coercive that it is the functional equivalent of an arrest." ***Id.*** at 1032.

> The numerous factors used to determine whether a detention has evolved into an arrest include the cause for the detention, the detention's length, the detention's location, whether the suspect was transported against his or her will, whether physical restraints were used, whether the police used or threatened force, and the character of the investigative methods used to confirm or dispel the suspicions of the police.

***Id.*** (citation omitted).

In the present case, the trial court found ***Miranda*** warnings were not required. The court opined:

> [G]iven all the circumstances surrounding the time when [Perry] made his statement, ***Miranda*** warnings were not required from Officer Ayres as [Perry] was not in custodial detention or facing custodial interrogation during the duration of the traffic stop. Like in ***Clinton***, the investigatory traffic stop had not concluded when [Perry] made his statement. At the time[] when [Perry] made his incriminating statement, revealing that there was a gun located in the center console of his vehicle, no driver's license, registration, or proof of insurance was provided to Officer Ayres.[8] Additionally … [Perry] had not been transported against his will when the incriminating statement was made.
>
> Furthermore, no physical restrains were placed on [Perry] when he made his statement. Moreover, Officer Ayres did not threaten [Perry] with any force throughout the course of the traffic stop. Most markedly, Officer Ayres' questions, "Do you have any weapons on you?," in no way threatened, demanded, deceived or tricked [Perry] into incriminating himself, nor did

---

[8] Upon our review of the record, it is unclear whether or not Perry provided Officer Ayres with his paperwork before the officer ordered him out of the vehicle. Nevertheless, as discussed *infra*, it is evident the initial stop had not concluded at the time Perry told the officer that he had a gun in the car.

Officer Ayres[] purposely word his question in an attempt to elicit a likely incriminating response from [Perry]. Lastly, [Perry's] incriminating statement was not made during or after a physical frisk but rather just prior to any physical frisk occurring.

Trial Court Opinion, 6/17/2016, at 16-17 (record citations omitted).

Our review of the record supports the trial court's findings. Officer Ayres testified that after stopping Perry's vehicle, he approached and asked Perry for his license and registration. *See* N.T., 4/6/2015, at 7. Officer Ayres described Perry as "extremely nervous" and stated his "arms were shaking." *Id.* While Perry was going through his paperwork, Officer Ayres observed a license to carry a firearm.[9] *See id.* At that point, the officer asked Perry, "Do you have any weapons on you?" *Id.* Officer Ayres testified that there was "a brief three to five-second hesitation, at which point [Perry] stated no." *Id.* Based on Perry's hesitation and extreme nervousness, Officer Ayres asked Perry to "step out of the car, just to conduct a frisk of him for weapons [.]" *Id.* Officer Ayres explained that as he was taking Perry out of the car – and before he conducted the frisk – he asked again if Perry had a weapon on him. *See id.* at 9. Under cross-examination, the officer elaborated:

I don't believe I actually had a chance to start patting him down. When I was asking him – as he's coming out, Are you sure you

---

[9] Officer Ayres did not learn until after he secured the weapon that Perry's license to carry had expired. *See* N.T., 4/6/2015, at 20. He explained that if the license had been valid, he would have "just held onto the gun until [he] could finish [the] stop." *Id.* at 21.

- 15 -

don't have any weapons on you, I might have been telling him, your (sic) shaking, your arms are shaking.  Then that's when he said, it's a gun in the car.

*Id.* at 16.[10]

Therefore, we agree Perry was not subject to a custodial interrogation the second time Officer Ayres asked him if he had a gun.  The question occurred during a valid traffic stop, and before a lawful frisk for weapons.  It is evident from the testimony that the second question was posed shortly after the stop, while the officer was **still investigating** the initial motor vehicle violation.  *Compare Commonwealth v. Tam Thanh Nguyen*, 116 A.3d 657, 667 (Pa. Super. 2015) (*Miranda* warnings required when "[a]fter ending the interaction based on the traffic violation, … [the state trooper] initiated a second round of questioning with the driver.").  Perry was not restrained, transported against his will, or threatened at the time the officer asked him if he was sure he had no weapons.  Accordingly, because we agree Perry was not subject to a custodial detention at the time he made the incriminating statement, no **Miranda** warnings were required before the officer's question.[11]

---

[10] Under redirect, Officer Ayres repeated that he "never actually frisked" Perry.  *Id.* at 20.  Rather, once Perry stated that he had a gun in the car, Officer Ayres "secured him real quick and placed him in the [patrol] car, so [he] could recover that gun."  *Id.* at 20-21.

[11] We note that "[i]n order to trigger the safeguards of **Miranda**, there must be both custody and interrogation."  **Commonwealth v. Cruz**, 71 A.3d 998, 1003 (Pa. Super. 2013) (quotation omitted), *appeal denied*, 81 A.3d 75 (Pa. 2013).  Because we find Perry was not in "custody" at the time of his
*(Footnote Continued Next Page)*

Accordingly, we conclude the trial court did not err in denying Perry's pretrial suppression motion, and we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 3/20/2017

---

*(Footnote Continued)* ───────────

statement, we need not determine whether he was subject to an "interrogation."