**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| NEIL GARDNER | : | |
| | : | |
| Appellant | : | No. 1958 EDA 2019 |

Appeal from the Judgment of Sentence Entered June 5, 2019
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0004542-2018

BEFORE:   BENDER, P.J.E., SHOGAN, J., and STRASSBURGER, J.[*]

MEMORANDUM BY BENDER, P.J.E.:                    Filed: March 18, 2021

Appellant, Neil Gardner, appeals from the judgment of sentence of 4-10 years' incarceration, imposed after the trial court found him guilty of persons not to possess, use, manufacture, control, sell or transfer firearms, 18 Pa.C.S. § 6105.   Herein, Appellant challenges the court's denial of his motion to suppress the seized firearm.   After careful review, we affirm.

The trial court summarized the facts adduced at the suppression hearing as follows:

> On April 25, 2018, a video captured a shooting that occurred in the area of 8th and Diamond Streets in Philadelphia, an area known for illicit drug sales, turf wars and gun violence.   []N.T.[,] 12/10/18, [at] 8, 13[].   Appellant was depicted in the video walking in and out of a store along with two men who began firing hand guns at Appellant and continued to do so as Appellant fled. [*Id.* at] 8-10[].   Philadelphia Police Officer Jason Seigafuse received a radio call to investigate the shooting.   This officer, who

---

[*] Retired Senior Judge assigned to the Superior Court.

worked in the area for fifteen years, proceeded to the location of the shooting and retrieved the video. [*Id.* at] 8-10, 13[]. The next day, having watched the video, Officer Seigafuse and his partner returned to the area of the shooting at about 6:00 p.m. and saw Appellant, who[m] the officer knew from a prior arrest. [*Id.* at] 10, 18[]. Officer Seigafuse exited his patrol car and asked to speak with Appellant. [*Id.* at] 10[]. Appellant replied, "Yes[,]" and began walking toward the officer. [*Id.* at] 8-10, 14[]. Appellant then fled into a vacant lot and continued running from the officer. [*Id.* at] 10-11, 14[].

Officer Seigafuse followed Appellant and noticed that he was grabbing his right front pants pocket. [*Id.* at] 11, 14-15[]. When Officer Seigafuse caught up to Appellant and grabbed him, a struggle ensued, and Appellant attempted to push the officer away. [*Id.* at] 11, 21-22[]. During the struggle, Appellant continued to hold his right pants pocket, which caused the officer to fear that Appellant might be armed. [*Id.* at] 11[]. Based on that fear, Officer Seigafuse drew his service revolver and Appellant put his hands in the air. [*Id.*]

After Appellant placed his hands in the air, Officer Seigafuse took Appellant to the ground. [*Id.* at] 8-10[]. Appellant then volunteered that he had a gun in his right front pants pocket[,] after which the officer retrieved an operable and loaded .45 caliber handgun. [*Id.* at] 11, 23, 46[].[2]

> [2] A later search of Appellant resulted in the recovery of eight clear jars containing marijuana. [*Id.*] 11, 25[].

Trial Court Opinion ("TCO"), 12/23/19, at 2-3.

Subsequently, the Commonwealth charged Appellant for his possession of the seized firearm pursuant to Section 6105.[1] Appellant filed a suppression motion, which the court denied at the conclusion of the December 10, 2018 hearing. Immediately thereafter, the case proceeded to a bench trial, wherein the transcript from the suppression hearing was incorporated by mutual

---

[1] The Commonwealth charged Appellant with several other crimes, however, the Section 6105 violation was the only offense it pursued to trial.

consent. The trial court then rendered a guilty verdict. On February 15, 2019, the court sentenced Appellant to 6-12 years' incarceration. Appellant filed a timely post-sentence motion, which the trial court granted. Subsequently, on June 5, 2019, the court resentenced Appellant to 4-12 years' incarceration. Appellant filed a timely notice of appeal, and a timely, court-ordered Pa.R.A.P. 1925(b) statement. The trial court issued its Rule 1925(a) opinion on December 23, 2019.

Appellant now presents the following question for our review:

> Did not the trial court improperly deny a motion to suppress evidence because police lacked even reasonable suspicion under the Fourth Amendment and the expanded protections of Article 1, Section 8 of the Pennsylvania Constitution to stop, detain or arrest [Appellant], a witness to a crime who did not seek out the police, and who ran from the police in a "high crime area" when the police attempted to question him and then immediately pursued him?

Appellant's Brief at 3.

Our standard of review for the issue before this Court is well-settled:

> When reviewing the denial of a motion to suppress evidence, we examine the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in context of the record as a whole. We then determine whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Our review of the application of the law to the facts is plenary.

*Commonwealth v. Washington*, 51 A.3d 895, 897 (Pa. Super. 2012) (cleaned up).

> There are three types of encounters between law enforcement officials and private citizens. A "mere encounter" need not be supported by any level of suspicion but carries no official

- 3 -

compulsion to stop or respond. ***Commonwealth v. Clinton***, 905 A.2d 1026, 1030 (Pa. Super. 2006)…. An "investigative detention" must be supported by reasonable suspicion and subjects the suspect to a stop and a period of detention, but it does not have the coercive conditions that would constitute an arrest. ***Id.*** The courts determine whether reasonable suspicion exists by examining the totality of the circumstances. ***In the interest of D.M.***, … 727 A.2d 556, 559 ([Pa.] 1999). An arrest, or "custodial detention," must be supported by probable cause. ***Clinton***, 905 A.2d at 1030.

***In Interest of J.G.***, 145 A.3d 1179, 1185 (Pa. Super. 2016).

Here, it is undisputed that Officer Seigafuse's interaction with Appellant began as a mere encounter. However, as this Court has previously recognized:

> Article I, Section 8 of the Pennsylvania Constitution and the Fourth Amendment of the United States Constitution afford protections against unreasonable searches and seizures. Among the protections is the requirement that an officer have reasonable suspicion before conducting an investigatory stop. ***See Terry v. Ohio***, 392 U.S. 1, 30 … (1968); ***Commonwealth v. Hicks***, … 253 A.2d 276, 280 ([Pa.] 1969). Our Supreme Court has, however, interpreted Article I, Section 8 protection more broadly than the Fourth Amendment and has found that a seizure occurs when an officer gives chase. ***Compare California v. Hodari D.***, 499 U.S. 621, 629 … (1991), ***with Commonwealth v. Matos***, … 672 A.2d 769, 776 ([Pa.] 1996). Under Pennsylvania law, any items obtained as the result of a pursuit are considered fruits of a seizure. ***See generally Matos***, 672 A.2d at 770. Those items may be received in evidence only when an officer, before giving chase, has at least the reasonable suspicion necessary for an investigatory detention. ***Id.*** at 771.

***Commonwealth v. Gray***, 784 A.2d 137, 141–42 (Pa. Super. 2001).

Thus, under the Pennsylvania Constitution, an investigative stop occurred when Officer Seigafuse began his pursuit of Appellant. Any contraband seized from Appellant should have been suppressed by the trial

court absent a showing that Officer Seigafuse possessed reasonable suspicion that Appellant was engaged in criminal activity when Officer Seigafuse gave chase.[2]  Reasonable suspicion

> requires a finding that based on the available facts, a person of reasonable caution would believe the intrusion was appropriate. Reasonable suspicion exists only where the officer is able to articulate specific observations which, in conjunction with reasonable inferences derived from those observations, led him reasonably to conclude, in light of his experience, that criminal activity was afoot and that the person he stopped was involved in that activity.  Therefore, the fundamental inquiry of a reviewing court must be an objective one, namely, whether the facts available to the officer at the moment of intrusion warrant a [person] of reasonable caution in the belief that the action taken was appropriate.  Reasonable suspicion for an investigative stop cannot rest on … mere presence … in a high crime area.  Likewise, flight, in and of itself, does not constitute reasonable suspicion of criminal conduct to justify a stop.

*Commonwealth v. Chambers*, 55 A.3d 1208, 1215 (Pa. Super. 2012) (cleaned up).

The trial court provided the following analysis in support of its determination that Officer Seigafuse possessed reasonable suspicion to conduct an investigative stop of Appellant:

_____

[2] Appellant concedes that when he was ultimately apprehended, Officer Seigafuse "possessed enough facts to warrant the arrest of Appellant and the subsequent search of Appellant incident to arrest. Those facts include Appellant's flight, Appellant's holding his pocket while he ran, the officer's experience suggesting that this action indicated that Appellant had a weapon, and Appellant's statement that he possessed a gun."  Appellant's Brief at 10. Thus, our attention is focused solely on the facts known to Officer Seigafuse at the time of the investigative detention that occurred when he began chasing Appellant.

Police initially approached Appellant to discuss his involvement in the prior day[']s shooting. On approach, Appellant inexplicably fled while holding what appeared to be a large, heavy object in his pants pocket. The unprovoked flight, in a high crime area, warranted police pursuit. The totality of circumstances clearly established that Appellant likely was involved in criminal activity when he inexplicably fled after agreeing to speak to Officer Seigafuse. Here, the day after a shooting occurred during which Appellant was the intended victim, police obviously wanted to speak to Appellant after Officer Seigafuse recognized Appellant in the video based on previous encounters. Upon spotting Appellant, Officer Seigafuse merely approached Appellant to ask if he would agree to talk. Appellant initially agreed but then, for no apparent reason, fled without provocation. This initial interaction clearly was a mere encounter[,] given that Officer Seigafuse did not give any orders to Appellant or engage in any conduct that would cause a person to believe that he was not free to leave.

When Officer Seigafuse started to approach, Appellant immediately began to run. The dynamic changed[,] giving the officer reason to believe that Appellant may be involved in criminal activity. That belief was confirmed and became likely when Appellant took hold of his right front pocket leading Officer Seigafuse to believe that he may be armed and dangerous. In addition, these events occurred in a high drug and crime area well known for gun violence, facts Officer Seigafuse was well familiar with. The officer had been assigned to the neighborhood for fifteen years and knew the crimes that occurred therein, including "turf wars." His experience coupled with the other facts and circumstances more than justified the officer's pursuit and detention of Appellant.

TCO at 7-8 (citation omitted).

Initially, Appellant contests the trial court's summation of the facts with respect to Officer Seigafuse's observation of Appellant's reaching for his pocket/waistband when in flight as justification for the temporary detention. Appellant argues that "this additional development of facts (that Appellant was holding his pocket in a manner suggestive of being armed) occurred only after the officer's chase of Appellant, and therefore [after] the officer's seizure of

Appellant under Pennsylvania law[.]"  Appellant's Brief at 12 n.4.  The Commonwealth disputes this account, insisting that

> [Appellant]'s factual assertion is belied by the record.  Officer Seigafuse testified that he chased [Appellant] after he "took off running through a lot[.]"  N.T., 12/10/18, at 11.  Asked when it was that [Appellant] started grabbing at his waistband, the officer replied: "As soon as he hit the edge of the lot.  So the—at the curb, he hits the edge of the lot and he's running, holding it[.]"  ***Id.*** at 14-15.  The officer further explained that [Appellant] had his hand at his waistband "the whole time" he ran[.]  ***Id.*** at 11.  Thus, contrary to what [Appellant] claims, his grabbing at his waistband occurred before Officer Seigafuse pursued him and may be considered in determining whether reasonable suspicion existed.

Commonwealth's Brief at 12 n.4 (citations reformatted).

We agree with Appellant.  Officer Seigafuse testified that, "As I started to walk around the car, [Appellant] took off running through a lot.  I started to chase him.  As he -- as he was running, he was holding his right front pant's pocket as he was running the whole time."  N.T., 12/10/18, at 11.  Whatever ambiguity there was in that statement was soon resolved upon further questioning by the prosecutor during the following exchange:

> Q[:] How far away were you from him when you first started running?
>
> A[:] I mean, he was walking towards the vehicle, towards the -- the length of the vehicle.  Maybe another, I would say, 10 to 15 feet tops.
>
> Q[:] How far away was he from -- how far after the initial encounter when he first started running did you see him start grabbing his waistband?
>
> A[:] As soon as he hit the edge of the lot. So the -- at the curb, he hits the edge of the lot and he's running, holding it.

*Id.* at 14-15.

The record clearly belies the Commonwealth's account. Officer Seigafuse indicated that he immediately began chasing Appellant when he took flight. Appellant ***ran through the lot***, and Officer Seigafuse stated that he first observed the hand movement toward Appellant's waistband as Appellant ***reached the end of the lot***. At no point did Officer Seigafuse indicate that he only began chasing Appellant after he noticed Appellant's hand movement. Accordingly, we agree with Appellant that this observation cannot serve to support a finding of reasonable suspicion to engage in the pursuit.

Nevertheless, it is undisputed that Appellant fled from police in a high crime area. These two facts, although innocent in isolation, ***see Chambers***, ***supra***, have been held to be sufficient, in combination, to support a finding of reasonable suspicion, ***see Commonwealth v. Jefferson***, 853 A.2d 404 (Pa. Super. 2004).

The precise question before this Court in ***Jefferson*** was "whether the observation of [the] appellant in a high crime area and [his] flight from police combine to establish the familiar ***Terry*** standard of reasonable suspicion." ***Id.*** at 405. The ***Jefferson*** Court began its analysis by recognizing that, in ***Illinois v. Wardlow***, 528 U.S. 119 (2000), "The United States Supreme Court held that although mere presence in a high crime area is insufficient to support a ***Terry*** stop, the additional factor of unprovoked flight was indeed relevant. The Court ultimately concluded that the two factors in combination were

sufficient to satisfy the ***Terry*** standard of reasonable suspicion[, hereinafter, 'the ***Wardlow*** Rule']." ***Jefferson***, 853 A.2d at 406.

The ***Jefferson*** Court then considered whether additional protections existed under the Pennsylvania Constitution. However, the ***Jefferson*** Court determined that our Supreme Court had already answered that question in ***In the Interest of D.M.***, 781 A.2d 1161 (Pa. 2001) ("***D.M. II***"), wherein the Supreme Court reversed its prior decision in ***In the Interest of D.M.***, 743 A.2d 422 (Pa. 1999) ("***D.M. I***"), based, in part, on ***Wardlow***. Recognizing that our Supreme Court has consistently followed the federal rationale in cases involving interpretation of ***Terry***, and that "the ***D.M. II*** court specifically addressed and rejected the suggestion that it depart from the federal high court's reasoning on state constitutional grounds[,]" the ***Jefferson*** Court concluded that flight from police in a high crime area was also sufficient to establish reasonable suspicion under the Pennsylvania Constitution. ***Jefferson***, 853 A.2d at 406.

Nevertheless, Appellant argues that we should reject application of the ***Wardlow*** Rule under the facts of this case, first citing to concurring and dissenting opinions from various courts that have called that rule into question. ***See*** Appellant's Brief at 14-16. None of these criticisms of the ***Wardlow*** Rule reflects the current state of the law, as Appellant fails to cite any controlling case at odds with the ***Jefferson*** Court's conclusion that the ***Wardlow*** Rule represents both the Federal and State Constitutional standard applicable in Pennsylvania.

Appellant also argues that the **Wardlow** Rule effectively "subordinates the totality of the circumstances test" to "a two-factor (*i.e.*, unprovoked flight and a high crime area) *per se* rule." Appellant's Brief at 17. He analogizes to our Supreme Court's rejection of the **Robinson** Rule[3] in **Hicks**.

**Hicks** is distinguishable. In that case, our Supreme Court rejected the **Robinson** Rule because,

> rather than requiring a particularized and objective basis for suspecting an individual, the [**Robinson**] Court has deemed the conduct of the individual to be functionally irrelevant to the analysis. Such is a danger of *per se* rules, pursuant to which the totality of the circumstances inquiry—the whole picture—is subordinated to the identification of one, single fact. This is distinctly problematic where, as discussed above, the single fact isolated from the remainder of the circumstances is an activity that is indistinguishable from lawful conduct.

**Hicks**, 208 A.3d at 939 (cleaned up).

Under the **Wardlow** Rule, although the high-crime-area factor cannot establish **individualized** suspicion by itself, it is the flight-from-police factor that demonstrates that the fleeing individual, rather than any other member of the community situated in the same high crime area, warrants particularized concern by police. In **Hicks**, our Supreme Court identified the problem of *per se* rules under search and seizure analyses as being reliant on

---

[3] In **Commonwealth v. Robinson**, 600 A.2d 957 (Pa. Super. 1991), *overruled by* **Commonwealth v. Hicks**, 208 A.3d 916 (Pa. 2019), the Superior Court held that the observation by police of the possession of a concealed firearm by an individual in public was sufficient to create a reasonable suspicion to justify a **Terry** stop in order to determine whether that individual was properly licensed.

"one, single fact[,]" and particularly on a solitary fact that was "indistinguishable from lawful conduct." ***Hicks***, 208 A.3d at 939. Here, the ***Wardlow*** Rule does not involve reasonable suspicion based on a single fact.

Nevertheless, we agree with Appellant that *per se* rules are generally disfavored, as the overarching standard under both the Fourth Amendment and Article I, Section 8, demands consideration of the totality of the circumstances known to the officer at the time a seizure is effectuated. Recently, for instance, this Court rejected recognition of a *per se* rule that the odor of marijuana, by itself, always establishes probable cause to conduct a search. ***See Commonwealth v. Barr***, 240 A.3d 1263, 1276 (Pa. Super. 2020). We noted therein that a "*per se* rule undermines the very nature of the totality-of-the-circumstances test for probable cause, which is a fluid concept-turning on the assessment of probabilities in particular factual contexts not readily, or even usefully, reduced to a neat set of legal rules." ***Id.*** (cleaned up). In ***Barr***, we determined that, at suppression, the lower court "was free to weigh the inference of criminality implied by the odor of marijuana ***against other relevant facts known to the officers*** in determining whether they possessed probable cause to conduct the search." ***Id.*** (emphasis added). In that case, before they conducted a search of Barr's vehicle, the police were presented with a medical marijuana card that potentially undermined the assumption of criminality. ***See id.*** at 1288.

Likewise, with respect to the ***Wardlow*** Rule, there may some circumstances in which ***additional*** facts tend to undermine the

- 11 -

reasonableness of the suspicion of criminal activity that stems from the observation of flight from police in a high crime area. Appellant argues that such additional facts are present here:

> Turning now to the instant matter, it must be appreciated that the officer's stop of Appellant here did not occur in a factual vacuum. When the officer exited his vehicle and asked to talk to Appellant, Appellant was being confronted by an officer who had previously assisted in the arrest of Appellant. That such a talk was a prelude to further detention of Appellant by this officer must have appeared to Appellant as a not insignificant possibility, notwithstanding the fact that Appellant was the victim of the crime being investigated by the officer. Furthermore, Appellant was accosted near the very location in which he had been shot at the day before. Since Appellant was the intended target of gun violence in that area, being seen talking to the police, perhaps being seen by the very persons who had shot at him, would give those persons greater incentive to carry through with their harmful intentions towards Appellant, as well as perhaps gaining Appellant further opprobrium in the neighborhood by being labeled as a snitch. In addition, as present experiences have taught, the specter of unlawful harm by the police is always present.

Appellant's Brief at 23. Appellant also contends, at various times throughout his brief, that it is relevant that Officer Seigafuse knew Appellant was the victim of the shooting under investigation, not a perpetrator and, thus, the officer did not initially approach Appellant with the suspicion that he was engaged in criminal activity.

We are not convinced that any of these additional circumstances undermined the trial court's determination that Officer Seigafuse possessed reasonable suspicion to pursue Appellant. We instead agree with the

Commonwealth that these potentially innocent reasons for Appellant's flight

are not relevant to our analysis:

> [Appellant] attempts to minimize the relevance of his flight as a factor in the reasonable-suspicion analysis by advancing non-criminal reasons as to why someone in his shoes may have wanted to flee from the police. But[,] the fact that he can conjure up innocent explanations for such a person's flight hardly undermines the lower court's conclusion that reasonable suspicion existed. This is because a finding of reasonable suspicion "need not rule out the possibility of innocent conduct." *United States v. Arvizu*, 534 U.S. 266, 277 (2002); *see also Commonwealth v. Carter*, 105 A.3d 765, 769 (Pa. Super. 2014) (*en banc*) ([stating that,] "even in a case where one could say that the conduct of a person is *equally* consistent with innocent activity, the suppression court would not be foreclosed from concluding that reasonable suspicion nevertheless existed") (emphasis in original). In fact, even the higher standard of probable cause does not require the police to rule out the possibility of an innocent explanation for otherwise suspicious facts. *District of Columbia v. Wesby*, 138 S.Ct. 577, 588 (2018). Significantly, in … *Wardlow*, *supra*—which itself held that flight in a high-crime area provides sufficient basis to stop an individual for investigation—the United States Supreme Court rejected the very argument advanced by [Appellant]:

>> Respondent and *amici* also argue that there are innocent reasons for flight from police and that, therefore, flight is not necessarily indicative of ongoing criminal activity. This fact is undoubtedly true, but does not establish a violation of the Fourth Amendment. Even in *Terry*, the conduct justifying the stop was ambiguous and susceptible of an innocent explanation. The officer observed two individuals pacing back and forth in front of a store, peering into the window and periodically conferring. [*Terry*,] 392 U.S. at 5–6. All of this conduct was by itself lawful, but it also suggested that the individuals were casing the store for a planned robbery. *Terry* recognized that the officers could detain the individuals to resolve the ambiguity. *Id.* at 30.

> []*Wardlow*, 528 U.S. at 125 (parallel citations omitted); *see also* … *Carter*, 105 A.3d at 772-73 (noting that "in *Terry* itself, the

conduct of the defendant could have easily been characterized as completely innocent").

Commonwealth's Brief at 14-15. Indeed, the desire to avoid visible contact with police in a high crime area may very well lead many to flee from police for non-criminal reasons, such as the desire to avoid negative social consequences, and Appellant's prior interactions with Officer Seigafuse do not make him unique in that regard. This same motivation could be in play in most cases involving application of the **Wardlow** Rule. However, the mere potential for a non-criminal reason for taking flight does not negate a finding of reasonable suspicion. As the **Wardlow** Court recognized, "[h]eadlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." **Wardlow**, 528 U.S. at 124.

Moreover, the fact that Officer Seigafuse was not initially investigating Appellant as the perpetrator of a shooting, but as a victim, is also irrelevant to our analysis. **Jefferson** is instructive here. In that case, police "were on marked patrol in a Philadelphia neighborhood in which drug sales were common and a shooting recently occurred." **Jefferson**, 853 A.2d at 405. Subsequently, "[w]hen the officers observed [the] appellant and another man on the street in the area, the men promptly ran away. The officers stopped to investigate and the pair responded by fleeing in a different direction. The police then gave chase…." **Id.** Nevertheless, the **Jefferson** Court applied the **Wardlow** Rule. **Id.** at 407. The fact that Appellant was initially being approached due to his status as a victim is effectively no different than had

he been approached for no particular reason at all. This is because the nexus between Appellant's conduct and the suspected criminal activity justifying the seizure stemmed solely from his flight from police in a high crime area, not from Officer Seigafuse's observation of Appellant on the video of the shooting.

In sum, Appellant has not demonstrated that any additional circumstances known to Officer Seigafuse undermine the reasoning of the ***Wardlow*** Rule. The ***Wardlow*** Rule assumes that there may be innocent explanations for flight from police, but nevertheless holds that the observation of flight from police in a high crime area provides sufficient individualized suspicion that criminal activity is afoot so as to justify a ***Terry*** stop. Additionally, to the extent that Appellant asks this Court to reconsider ***Jefferson***, we are compelled to decline that invitation.[4] "As a subsequent panel reviewing an issue already decided by a panel of this Court, we are obligated to follow the law as articulated by the previous panel." ***Commonwealth v. Pepe***, 897 A.2d 463, 466 (Pa. Super. 2006).

Judgment of Sentence ***affirmed***.

---

[4] In this regard, Appellant provides several arguments and citations to relevant research that collectively suggests that the observation of flight from police in a high crime area is not "a reliable indication of criminal activity." Appellant's Brief at 17. While we share at least some of Appellant's concerns about the ***Wardlow*** Rule, ***see Barr***, 240 A.3d at 1291 (Strassburger, J., concurring), it is simply beyond the authority of this panel to reject the rule's application in Pennsylvania given this Court's prior decision in ***Jefferson***.

Judge Strassburger did not participate in the consideration or decision of this case.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 3/18/21