J-S30038-25          2026 PA Super 63

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
                                              : PENNSYLVANIA
                    Appellant       :
                                              :
                                              :
                                              :
              v.                    :
                                              :
                                              :
                                              :
    IMAIR B. TOLIVER               :   No. 2395 EDA 2024

Appeal from the Order Entered August 21, 2024
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0004775-2023

BEFORE:   OLSON, J., MURRAY, J., and FORD ELLIOTT, P.J.E.[*]

OPINION BY FORD ELLIOTT, P.J.E.:                    **FILED MARCH 27, 2026**

Appellant, the Commonwealth of Pennsylvania, appeals the August 21, 2024 order granting the omnibus pre-trial suppression motion filed by Appellee, Imair B. Toliver.[1]  After careful review, we reverse the suppression order and remand for proceedings consistent with this opinion.

In this case, the police charged Appellee with carrying a firearm without a license and carrying a firearm on public streets or public property in Philadelphia.[2]  **See** Bills of Information, 7/18/23, 1.  The suppression court summarized the relevant facts and suppression ruling as follows:

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] The Commonwealth certified that the suppression court's August 21, 2024 order will terminate or substantially handicap its prosecution of this case.  **See** Notice of Appeal, 8/29/24, 1.

[2] 18 Pa.C.S. §§ 6106(a)(1), 6108.

The evidence adduced at the [suppression] hearing showed that[,] on June 19, 2023, [i]n the 700 block of West Erie Avenue, Police Officer Chris Irwin and his partner conducted a vehicle stop for expired registration. [Appellee] was the front seat passenger in the vehicle[,] and his father was the driver. Officer Irwin's body worn camera video of the vehicle stop was played for th[e c]ourt at the hearing. When Officer Irwin initially approached the vehicle, he first spoke to [Appellee's] father and asked him for his license and registration. He also asked whether anyone in the vehicle had a license to carry a firearm. [Appellee's] father denied having a license to carry while [Appellee] stared straight ahead and did not respond. Officer Irwin then asked whether there was a firearm in the vehicle and both [Appellee] and his father shook their heads[,] "[N]o."

Officer Irwin testified that he returned to his police vehicle to run their [identification cards], and from where he was sitting inside the police vehicle, he could "see movement to the right and left of the vehicle, reaching around, stuff that kind of just was maybe suspicious." He further testified that [Appellee] was "bending in an abnormal position," and "you could tell they were not reaching for something that you normally reach for. It was a quicker movement on the side of both seats."

Officer Irwin exited his police vehicle and approached [Appellee] on the passenger side. He testified that[,] as he approached, he saw [Appellee] reach down "to the right side between the arm and the door as to be clenching something. Not in his fist, almost like his forearm against his body, which made me suspicious." Officer Irwin asked the driver to turn off the vehicle[,] and he took possession of the keys. He then ordered [Appellee] and his father to exit the vehicle. Once [Appellee] was out of the vehicle, Officer Irwin placed [Appellee's] hands on the roof of the car. Officer Irwin then noticed the butt end of a pistol sticking out of the rear pocket of [Appellee's] athletic shorts and immediately put him in handcuffs. While he was placing the [hand]cuffs, Officer Irwin asked [Appellee] whether he had a license to carry a firearm and [Appellee] responded, "[N]o." Officer Irwin then placed [Appellee] into the back of the police vehicle.

At the conclusion of the argument from both counsel, th[e suppression c]ourt granted [Appellee's] motion to suppress, finding that Officer Irwin did not have independent reasonable suspicion, under [**Commonwealth v. Hicks**, 208 A.3d 916 (Pa.

2019)], to inquire whether [Appellee] had a license to carry a firearm.

Suppression Court Opinion, 12/20/24, 2-3 (record citations omitted; section breaks added).

In their proper context, Officer Irwin described the movement he saw in the vehicle as follows:

Q.    Can you describe the movement you saw?

A.    Bending in an abnormal position.  It wasn't like reaching forward to the glove box, it was more like reaching down to the left side of the seat in between the center console, reaching down to the right side.

Q.    And where was the movement coming from?

A.    The passenger side.

Q.    Passenger side.  Did you notice anything else in terms of movement?  How quick were they?

A.    They were, like I said, you could tell they were not reaching for something that you normally reach for.  It was a quicker movement on the side of both seats.

N.T. Suppression Hearing, 8/21/24, 14-15.  Officer Irwin testified that the observed movements continued upon the officers' return to the vehicle after conducting the identification check:

Q.    Can you just describe why took you [*sic*] the actions you took in the portion [of the body camera footage] that we just saw?

A.    The vehicle was still on as I approached the passenger side. [Appellee] immediately reached down to the right side of his leg in between --

Q.    Excuse me.   The passenger you said?

> A.   Yes.  As you go inside of the vehicle, he reached down to the right side between the arm and his [*sic*] of the door as to be clenching something.  Not in his fist, almost like his forearm against his body, which made me suspicious.  You can't see it on the camera, my partner is still in the vehicle[,] and I asked him to approach with me.  He comes up, just for a safety measure, I ask them to turn the vehicle off and took possession of the keys.

*Id.* at 16.

Officer Irwin testified that he saw the end of the pistol sticking out of the pocket of Appellee's shorts upon Appellee's removal from the vehicle:

> A.   … [W]e had the passengers come of the vehicle.  Coming out of the vehicle, I placed [Appellee's] hands on the vehicle[,] and I noticed the butt end of the pistol.  He had kind of like athletic shorts on, so it was sticking out of the pocket, the right pocket.  I then placed my hand over the top, just to verify it was not a cell phone or wallet.  At that time[,] it was an L-shaped metal object.  Like I said, I could see the butt end of a pistol and he was detained.
>
> * * *
>
> I noticed the buttstock on [the gun] from the texture.  I could see the magazine as well.

N.T. Suppression Hearing, 8/21/24, 16-17.  Officer Irwin then asked Appellee "for a second time if he was licensed to carry," to which Appellee said, "No." *Id.* at 18.  "At that time[, Appellee] was detained and arrested and put in the back of the car." *Id.*

At the suppression hearing, Officer Irwin was the lone testifying witness. *See* N.T. Suppression Hearing, 8/21/24, 9-25.  Appellee's counsel did not contest the reason for the car stop. *See id.* at 4.  Prior to the presentation of the evidence, Appellee argued that the gun and Appellee's answer to the post-discovery-of-the-gun question about whether he had a firearm license should

- 4 -

have been suppressed because he was arrested without probable cause and the officers asked him "too late" about firearm licensing:

> [APPELLEE'S COUNSEL]: … Upon approach of the vehicle, according to the officers, my client was acting nervous[,] and they ordered my client to be removed from the vehicle. I'll suggest ordinarily they can ask people to be removed from the vehicle. However, I would suggest their detention went further than what the law has allowed. They immediately cuffed him and[,] at some point, they claimed to have seen a firearm on his person or in a pocket nearby. In the midst of that, they cuff him and then ask him -- after he's detained and arrested, I would suggest they ask him if he had a license to carry when he was not Mirandized for that. I'll suggest it does not reach the requisite probable cause to take those actions and ask questions under **Hicks**. I suggest it's too late. It's not under a mere encounter while my client was in custody, he wasn't Mirandized at that point. So[,] for those reasons, Judge, I would move to suppress the firearm and the statement for my client that they elicited suggesting that he did not have a license to carry, which I would suggest also would eradicate the arrest in this case.
>
> * * *
>
> I would suggest that he was more than detained. I would also suggest that it is not what the officer's opinion is, it's going to be Your Honor's opinion based on the officer's body cam[era] and him saying, I'm only detaining you, but I'll suggest at that point, it's common sense to say they're not.

*Id.* at 5.

During arguments by counsel following the presentation of the evidence, the court agreed that Appellee did not respond to the first question about whether he had a license to carry a firearm. **See** N.T. Suppression Hearing, 8/21/24, 26. Appellee's counsel then renewed his earlier argument that Appellee was under arrest at the moment he was handcuffed, there was

no probable cause for that arrest, and any response to the second question about licensure was inadmissible in the absence of a **Miranda**[3] warning:

> [Appellee's Counsel]: He actually nodded his head no to the weapon. The only time any audible or inaudible response came to a question -- now we're talking about **Hicks** … the only time an audible response came with regards to that question was after he was placed in [hand]cuffs. You Honor can clearly hear as I suggested, he was pulled out of a car, if we're taking the officer's credibility, he saw a firearm in plain view, I would suggest he's within his rights, I guess, [to] secure himself, but not question him with regards to whether or not he had a license to carry or not without **Miranda** [warnings] because he is in custody at that point. The keys to the vehicle have been turned off, he's in [hand]cuffs, there's armed police officers, we're no longer in the mere encounter stage. The mere encounter stage is when we walk up. So I would suggest that this arrest was therefore unlawful. There was no probable cause. The way they could have gotten probable cause was a variety of ways. First, do a check to say, ["]Hey, we recovered a gun,["] let me check. Two, Mirandize him and then ask him to give [an] answer or whatever it is. But that didn't happen here. What happened is what happened.
>
> So what happened was … no question was asked of him. I would suggest if I was in the car with dad, and they asked him if he had a license [to] carry, that doesn't matter. I don't even know -- said father-son relationship, but even in the sequestration that didn't make it on this record -- but even if that was the case, we're on a slippery slope of what dad of an adult son knows or doesn't know. That question, I suggest, was not posed to him and if it was, there was no answer. I just want to point those two facts out, Judge.

**Id.** at 26-27.

The Commonwealth argued in response that the police officers were permitted to remove Appellee from the car at which time they saw the gun

_____

[3] **Miranda v. Arizona**, 384 U.S. 436 (1966).

protruding from Appellee's shorts and were allowed to frisk him to confirm the existence of the gun:

> [The Prosecutor]: … We then move back to the police vehicle, where this officer specifically testified that he sees for the duration of about a minute, the passenger side movements within the vehicle. As if, you know, ducking down and what have you in terms of the movements that he sees in the vehicle from, you know, I think he said an estimate of 30 seconds to a minute in the vehicle itself. That, again, raises his decisions that there may be something present in the vehicle like a firearm. That's why he then moves during the second interaction, moving up to the vehicle on the passenger side. So whatever he saw in that vehicle made him respond to that passenger side of the vehicle. During that interaction, Your Honor, I think the officer once again asks those questions of [Appellee] and, again, I'll defer to the video, but I don't believe -- I believe at one point [Appellee] did give a response and shook his head no or said no. In regards to that, You Honor, the officer did say that he saw [Appellee] on that second approach, put his arm down, I think he said clenching or said he looked to be moving his arm quick down to his side. He then approaches the -- because the vehicle is still running -- the driver's side, he asks for the driver to turn off the vehicle and the keys. The officer then goes back to the passenger side and asked the passenger to get out of the vehicle, which according to **Pennsylvania v. Mimms**, [434 U.S. 106 (1977),] he has a right to do. He then sees in plain view, a butt of a firearm sticking out of the gym shorts of [Appellee]. He then, again pats down [Appellee] to confirm that it is indeed what he believes to be, because it's the same model and type that he carries. And just upon plain touch, he can tell immediately that it is a firearm given the fact that those prior interactions, the prior observations, and I would say, the prior statement that there is no weapon in the vehicle, no firearm in the vehicle, definitely rises to the level of a lawful stop here in regards to detaining [Appellee] because he now has just confirmed there is indeed not only a firearm in the vehicle, but on [Appellee's] specific person who we just observed and heard from during his interactions with the vehicle during the stop.
>
> And then in regards to the statement made after when he's in essentially handcuffs about the license to carry, I think is only confirming what he already knows to be true in terms of that there

is a firearm in the vehicle and that he, [Appellee], does not have a license to carry. But, again, I would say that there's already statements made beforehand that are not made prior for any kind of arrest, I would say.

N.T. Suppression Hearing, 8/21/24, 28-30.

The two issues focused on in the ensuing arguments of counsel were whether Appellee was subjected to an arrest lacking in probable cause, and, if the firearm was recovered as a result of that arrest, whether Appellee's admission as to his lack of a license to carry a concealed firearm was the product of a custodial interrogation absent any **Miranda** warning. **See** N.T. Suppression Hearing, 8/21/24, 25-46. After consideration of the arguments made, the court granted the suppression motion based on its understanding that the ruling was dictated by our Supreme Court's decision in **Hicks**:

> THE COURT: I have to grant this motion to suppress. **Hicks** is the winner today. There is case[ ]law that suggested being arrested, even being [hand]cuffed, even being put in the back of a police car[,] may not constitute an arrest, the custodial detention is a totality of the circumstances issue, but that **Hicks** case says that [the] officer should have checked before he asked this question.

N.T. Suppression Hearing, 8/21/24, 46.

The Commonwealth timely appealed. **See** Notice of Appeal, 8/29/24, 1. The Commonwealth and the suppression court have both satisfied their obligations under Pennsylvania Rule of Appellate Procedure 1925. **See** Order (Rule 1925(b)), 10/21/24, 1; Rule 1925(b) Statement, 10/29/24, 1; Suppression Court Opinion, 12/20/24, 1-12.

In its Rule 1925(a) opinion, the suppression court expands its original explanation for the grant of the suppression motion, rejecting the existence of furtive movements by Appellee and finding that Appellee's lie about the absence of a weapon in the car did not amount to reasonable suspicion of criminal activity:

> In the case at bar, the police improperly asked [Appellee] whether he had a firearms license without reasonable suspicion during an otherwise valid motor vehicle stop. The record shows that the police pulled over [Appellee's] father for driving with an expired registration and lawfully requested identification, asked whether there were any weapons in the car, instructed both [Appellee] and his father to exit the vehicle, and placed [Appellee] in handcuffs for officer safety. However, after listening to Officer Irwin's testimony and watching the body worn camera footage at the suppression hearing, th[e suppression c]ourt found that the police officers had no reasonable suspicion to further investigate whether [Appellee] had a valid firearms license. A review of the record shows that when police asked whether [Appellee] or his father had a license to carry, [Appellee] remained silent and did not reply. ***Granted, [Appellee] was untruthful about whether he had a gun in the car; however, telling a lie while not under oath is not a crime.*** In addition, Officer Irwin testified that from where he was sitting in the police car behind [Appellee's] father vehicle he could see "movement," "reaching around, stuff that kind of just was maybe suspicious" and that "you could tell they were not reaching for something that you would normally reach for." Officer Irwin further stated that[,] as he approached[,] he saw [Appellee] reach to the right side and clench something. ***However, th[e suppression c]ourt did not find that these were "furtive movements" that would give rise to the reasonable suspicion that [Appellee] was engaged in criminal activity as the officer was extremely vague and equivocal when he testified regarding what he claimed he could see.*** Th[e suppression c]ourt further found that there was no evidence that [Appellee] displayed any nervousness.

Suppression Court Opinion, 12/20/24, 8-9 (emphasis added; record and caselaw citations omitted). The court's post-hearing findings that Appellee's movements were not furtive, and did not give rise to reasonable suspicion differed from the court's contemporaneous remarks to counsel at the suppression hearing. *See* N.T. Suppression Hearing, 8/21/24, 34 ("These could all be considered furtive movements."); *id.* at 43 ("You reminded me somehow that this pat down happened, I hope you're listening, [Appellee's counsel], because he's [(the prosecutor)] getting this reasonable suspicion which even though he has right to take him out of the car to pat him down based on all of the furtive movements, but he sees the gun.").

The court also explains in its Rule 1925(a) opinion that the statement confirming the absence of a concealed carry license had to be suppressed because – given its finding of a lack of reasonable suspicion – the police had no reason to inquire as to Appellee's licensing status:

> Without any independent reasonable suspicion to believe that criminal activity was afoot, the police had no basis to investigate whether [Appellee] had a license to carry the firearm concealed on his person. As discussed above, simply carrying a firearm, even a concealed one, is not a sufficient basis "to create a reasonable suspicion that the individual may be dangerous, such that an officer can approach the individual and briefly detain him in order to investigate whether the person is properly licensed." Once [Appellee] was outside of the car in handcuffs, and the gun was secure, there was no reason for the police to inquire whether he had a license to carry as this was not in any way connected to the purpose of the routine traffic stop for expired registration. Since police did not have any reasonable suspicion to believe [Appellee] was involved in any kind of criminal activity, this [c]ourt properly granted [Appellee's] motion to suppress the gun and the statements given to police.

- 10 -

Suppression Court Opinion, 12/20/24, 9-10 (citations omitted).

The court clarified that it concluded there was nothing unlawful about the manner in which the police came into the possession of Appellee's gun, but it reasoned that the questioning about whether Appellee had a firearms license required suppression of both the gun and Appellee's statement in response to the licensing question:

> This [c]ourt acknowledges that under the law of this Commonwealth, the police had the lawful right to seize [Appellee's] firearm for officer safety during a motor vehicle stop. However, the police did not have reasonable suspicion to ask [Appellee] about whether he had a license to carry a firearm and then arrest him for firearms violations when he said he did not. [T]his [c]ourt did not give great weight to Officer Irwin's testimony regarding alleged furtive movements and did not find that [Appellee] displayed any nervousness during the traffic stop that would give rise to suspicion. Without any independent basis for believing [Appellee] was engaged in criminal activity, the police had no reasonable basis to inquire into [whether Appellee had a] license to carry a firearm.

Suppression Court Opinion, 12/20/24, 10 (citation omitted). The suppression court further explained that the lack of a *Miranda* warning played no factor in its suppression decision: "At no time did this [c]ourt find that [Appellee] was subjected to custodial interrogation; rather, this [c]ourt found that the police officers, who already had [Appellee's] identification, should have checked their databases before questioning [Appellee] regarding his licensure status." *Id.* at 10-11.

The Commonwealth presents the following questions for our review:

- 11 -

I.      Did the trial court err by suppressing a firearm seized from [Appellee] during a lawful *Terry*[4] frisk, after he lied to police about possessing a firearm and made furtive, reaching movements in the vehicle?

II.     Did the trial court err by suppressing [Appellee's] admission that he did not have a permit to possess a firearm, as well as the firearm itself as a supposed fruit of that admission, based on the court's apparent conclusion that the officer *could theoretically* have verified [Appellee's] permit status by a different method?

Appellant's Brief, 3 (references to answers of the suppression court omitted; emphasis in original, citation formatted).

In the first issue presented, the Commonwealth asserts that the suppression court erred by misapplying **Hicks**: "Because **Hicks** does not prohibit police officers from relying on contextual factors *beyond* the mere presence of a firearm to determine whether reasonable suspicion exists, the suppression court's legal conclusion was erroneous." Appellant's Brief, 10 (emphasis in original). The Commonwealth concedes that, under **Hicks**, the mere possession of a firearm is not suggestive of criminal activity, but asserts that there were "specific and articulable facts and rational inferences from those facts," beyond mere possession of a firearm, that gave rise to reasonable suspicion in order to permit an investigative detention of Appellee. **See** Appellant's Brief, 11-12. In support of a finding of reasonable suspicion, the Commonwealth relies on Appellee's denial of the presence of a firearm in the car, prior to the plain view discovery of the firearm protruding from his

_____

4 **Terry v. Ohio**, 392 U.S. 1 (1968).

pocket, and the furtive movements described by the investigating police officer. *See id.* at 12-14.

In response, Appellee argues that the firearm was improperly seized by police as a result of a *Terry* frisk that was improperly conducted in the absence of reasonable suspicion. *See* Appellee's Brief, 7-12. He acknowledges that the police officers were generally permitted to remove him from his father's vehicle and concedes that the officers lawfully handcuffed him and took possession of the firearm from him for their safety, but he maintains that point "should have been the end of the traffic stop, as it related to [him]." *Id.* at 10-11. He alleges that police "had no reason to continu[e] the questioning of [him], after obtaining all [the] necessary information to complete the traffic investigation of [his] father," and that there was a lack of reasonable suspicion "to pursue an additional investigation of [him]."[5] *Id.* at 11. He notes that the suppression court was "unconvinced by the vague testimony pertaining to 'furtive movements'" and that the court found that there was no evidence of any nervousness on his part. *Id.* at 11-12. Although the suppression court found that he lied about the absence of a firearm in the car, *see* Suppression Court Opinion, 12/20/24, 9 ("Granted, [Appellee] was untruthful about whether he had a gun in the car…"), Appellee's analysis of

_____

[5] To the extent that Appellee asserts that the car stop had already concluded with respect to his father at the time of the recovery of the firearm from him, the suppression court did not make any such finding and we unable to discern any evidence from the record reflecting that the car stop otherwise concluded prior to the firearm's recovery.

the instant issue instead suggests that no lie occurred and that he was merely unresponsive as to the question about the existence of a firearm in the car. *See* Appellee's Brief, 10 ("Officers further questioned the occupants regarding any firearms located within the vehicle, to which Appellee did not respond.").[6]

We must review the order granting Appellee's motion to suppress under the following standard:

> When the Commonwealth appeals from a suppression order, we follow a clearly defined standard of review and consider only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted. The suppression court's findings of fact bind an appellate court if the record supports those findings. The suppression court's conclusions of law, however, are not binding on an appellate court, whose duty is to determine if the suppression court properly applied the law to the facts.
>
> Our standard of review is restricted to establishing whether the record supports the suppression court's factual findings; however, we maintain *de novo* review over the suppression court's legal conclusions.

---

[6] The suppression court's recitation of the facts and the body worn camera footage reflect that, at the start of the traffic stop, Officer Irwin inquired both about whether anyone in the vehicle had a license to carry a firearm and whether there was a firearm in the vehicle. *See* Suppression Court Opinion, 12/20/24, 2; Police Body Camera Footage, 1:42-1:49. The court's opinion and the body worn camera footage reflect that Appellee did not offer a response to the initial licensing question but responded, "No," to the question about whether there was a firearm in the car. *See* Suppression Court Opinion, 12/20/24, 2; Police Body Camera Footage, 1:42-1:49. In that same footage, Appellee merely stares at the officer and gives no response to the licensing question but clearly shakes his head to indicate, "No," to the firearm question and says, "No, sir," to the officer. *Id.* at 1:46-1:49.

***Commonwealth v. Korn***, 139 A.3d 249, 252-53 (Pa. Super. 2016) (citations omitted and formatting altered).

From the parties' briefs, we can infer that two facts are in dispute: (1) whether Appellant answered, "No, sir," to the officer's question about the presence of firearms in the car; and (2) whether Officer Irwin observed furtive movements by Appellee. Appellee denies that he offered a response to Officer Irwin's question about firearms. ***See*** Appellee's Brief, 2. For that stance, he relies on Officer Irwin's testimony that was unclear on that point. ***See id.***; ***see also*** N.T. Suppression Hearing, 8/21/24, 21 ("I don't know because he was interacting with my partner or --"). Because the suppression court found that Appellee answered, "No," to the question, and that finding was supported by the body worn camera footage viewed at the suppression hearing, it is binding on us. ***See*** Suppression Court Opinion, 12/20/24, 2; Police Body Camera Footage, 1:42-1:49.

As to the existence of furtive movements by Appellee, we noted above that the suppression court's position on that has been inconsistent. While the court's comments at the hearing suggested there was furtive movement, ***see*** N.T. Suppression Hearing, 8/21/24, 34, 43, the court's Rule 1925(a) opinion conclusively finds that the actions described were not furtive movements. ***See*** Suppression Court Opinion, 12/20/24, 10 ("th[e c]ourt did not find that these were 'furtive movements' that would rise to reasonable suspicion"); ***id.*** at 11 ("th[e c]ourt did not give great weight to Officer Irwin's testimony regarding alleged furtive movements"). Given that the suppression court rejected

Officer Irwin's testimony on this point in its Rule 1925(a) opinion and the officer's body worn camera footage did not offer an adequate vantage point for assessing the court's finding, we are bound to accept the court's finding as to an absence of furtive movements.[7] *See Commonwealth v. Layer*, 340 A.3d 352, 359 (Pa. Super. 2025) (*en banc*) ("it is the sole province of the suppression court to weigh the credibility of the witnesses. Further, the suppression court judge is entitled to believe all, part or none of the evidence presented").

The Commonwealth argues that the suppression court erred by misapplying *Hicks* and determining that the police had no right to lawfully seize the gun that the police officer saw protruding from Appellee's pocket.[8]

_____

[7] At the end of the suppression hearing, the court did not "enter on the record a statement of findings of facts and conclusions of law" as required by our rules of criminal procedure. *See* Pa.R.Crim.P. 581(I). We disapprove of such non-compliance with the unambiguous mandate in Rule 581(I) as, among other reasons, it may permit the losing party to make a more intelligent assessment of whether or not to pursue an appeal, and, in the instant case, would have provided a clearer record of the court's findings of fact. Notwithstanding the violation of that rule here, a remand would not serve the interests of judicial economy or justice as we can discern the findings of facts and conclusions of law of the suppression court from its Rule 1925(a) opinion. *See Commonwealth v. Millner*, 888 A.2d 680, 689 (Pa. 2005) (we may consider the merits of an appeal if "a remand for compliance [with Rule 581(I)] would not serve the interests of judicial economy or justice"); *Commonwealth v. Reppert*, 814 A.2d 1196, 1200 (Pa. Super. 2002) (*en banc*) (proceeding with suppression review "constrained to focus" on a suppression court's Rule 1925(a) opinion, where the suppression court did not enter findings of fact on the record at the conclusion of the suppression hearing).

*(Footnote Continued Next Page)*

As will be explained in greater detail below, we agree with the Commonwealth that *Hicks* was inapplicable to the instant case because Appellee's detected lie about the absence of a firearm gave rise to reasonable suspicion to permit an investigative detention of Appellee. Analysis of this claim requires us to review, in addition to our general suppression standards, the holdings of our Supreme Court in *Hicks*, which the suppression court stated below as its primary basis for granting Appellee's motion, and our own prior opinion in *Commonwealth v. Malloy*, 257 A.3d 142 (Pa. Super. 2021), on which the suppression court additionally relies.

"The Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution guarantee the right of the people to be secure in their persons, houses, papers, and possessions from unreasonable searches and seizures." *Commonwealth v. Joyner*, 348 A.3d 230, 236 (Pa. Super. 2025). Our Supreme Court has identified three types of warrantless interactions between law enforcement and private citizens in the context of suppression review:

_____

[8] The Commonwealth's argument overlooks that the suppression court ruled the gun was *properly* seized as a matter of ensuring the officers' safety during the car stop. *See* Suppression Court Opinion, 12/20/24, 10 ("Th[e c]ourt acknowledges that under the law of this Commonwealth, the police had the lawful right to seize [Appellee's] firearm for officer safety during a motor vehicle stop."). Nevertheless, we must review the Commonwealth's argument that there was reasonable suspicion for the seizure as the record demonstrates that the police obviously retained the firearm for purposes other than officer safety, even if the gun was initially seized for officer safety.

- 17 -

The first is a mere encounter, sometimes referred to as a consensual encounter, which does not require the officer to have any suspicion that the citizen is or has been engaged in criminal activity. This interaction also does not compel the citizen to stop or respond to the officer. A mere encounter does not constitute a seizure, as the citizen is free to choose whether to engage with the officer and comply with any requests made or, conversely, to ignore the officer and continue on his or her way. The second type of interaction, an investigative detention, is a temporary detention of a citizen. This interaction constitutes a seizure of a person, and to be constitutionally valid[,] police must have a reasonable suspicion that criminal activity is afoot. The third, a custodial detention, is the functional equivalent of an arrest and must be supported by probable cause. A custodial detention also constitutes a seizure.

No bright lines separate these types of encounters, but the United State Supreme Court has established an objective test by which courts may ascertain whether a seizure has occurred to elevate the interaction beyond a mere encounter. The test, often referred to as the "free to leave test," requires the court to determine whether, taking into account all of the circumstances surrounding the encounter, the police would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business. Whenever a police officer accosts an individual and restrains his freedom to walk away, he has seized that person.

*Commonwealth v. Adams*, 205 A.3d 1195, 1199-1200 (Pa. 2019) (citations, brackets, and some quotation marks omitted).

As to the second type of encounter, an investigative detention, our Supreme Court has noted:

To maintain constitutional validity, an investigative detention must be supported by a reasonable and articulable suspicion that the person seized is engaged in criminal activity and may continue only so long as is necessary to confirm or dispel such suspicion. The asserted grounds for an investigative detention must be evaluated under the totality of the circumstances. So long as the initial detention is lawful, nothing precludes a police officer from acting upon the fortuitous discovery of evidence suggesting a

different crime than that initially suspected—such as the odor of alcohol on the breath of a driver[.] However, an unjustified seizure immediately violates the Fourth Amendment rights of the suspect, taints the evidence recovered thereby, and subjects that evidence to the exclusionary rule.

***Hicks***, 208 A.3d at 927-28 (citations and internal quotation marks omitted).

At the start of this case, Appellee was a passenger in his father's car that was lawfully stopped with respect to an expired vehicle registration. We note that the police officers were permitted to order Appellee to exit the car without any need for reasonable suspicion prior to that removal. ***See Commonwealth v. Pratt***, 930 A.2d 561, 564 (Pa. Super. 2007) ("[F]ollowing a lawful traffic stop, an officer may order both the driver and passenger of a vehicle to exit the vehicle until the traffic stop is completed, even absent a reasonable suspicion that criminal activity is afoot[.]"). After Appellee complied and exited from the car, the investigating police officer was able to see, in plain view, from a lawful vantage point, that the end of a gun was protruding from Appellee's pocket. ***See*** N.T. Suppression Hearing, 8/21/24, 23. The question for the suppression court, and now our Court, is whether the viewing of that gun permitted the officers to deviate from their pursuit of the traffic stop to subject Appellee to an investigative detention concerning the legality of his possession of the gun. The Commonwealth maintains that there was reasonable suspicion to subject Appellee to an investigative detention whereas Appellee asserts that the removal of the gun "should have been the end of the traffic stop, as it related to Appellee" and the officers

should not have "extended the purpose of the traffic stop." Appellee's Brief, 11; *see also* Appellant's Brief, 13-14.

As we have addressed previously, police officers, during the course of a traffic stop are permitted to take action to both "address the traffic violation" as well as to "attend to related safety concerns" and, in the course of those tasks, may inquire as to whether persons present in the stopped vehicle are in possession of a weapon such as a firearm:

> The "mission" of a traffic stop is to "address the traffic violation" underlying the stop as well to "attend to related safety concerns." ***Commonwealth v. Ross***, 297 A.3d 787, 792 (Pa. Super. 2023) (citation omitted). An officer's mission includes "inquiries incident to the traffic stop[,] such as checking the driver's license," registration[,] and insurance[,] and determining whether the driver has any outstanding warrants. ***Id.*** (citation omitted). Importantly:
>
>> [T]asks relating to officer safety are also part of a traffic stop's mission when done purely in an interest to protect the officers. This safety interest stems from the fact that traffic stops are especially fraught with danger to police officers, so an officer may need to take certain negligibly burdensome precautions to complete his mission safely.
>
> ***Id.*** at 792-93 (quotation marks and citations omitted).
>
> As such, there are certain "actions police officers may undertake during a lawful traffic stop based solely on concerns for their safety and security and without independent justification or cause." ***Id.*** at 798. The legality of these actions involves balancing of the public interest in ensuring the safety of police officers against an "individual's right to personal security free from arbitrary interference by law officers." ***Pennsylvania v. Mimms***, 434 U.S. 106, 109 [] (1977) (citation omitted). In balancing those interests, precedent has established, for example, that an "officer may order the driver of a vehicle to exit the vehicle until the traffic

stop is completed, even absent a reasonable suspicion that criminal activity is afoot." *Commonwealth v. Wright*, 224 A.3d 1104, 1109 (Pa. Super. 2019) (citations, ellipses and brackets omitted). It has also established that, to protect their own safety, officers may ask drivers whether they have a weapon as a matter of course during a traffic stop. *See Commonwealth v. Clinton*, 905 A.2d 1026, 1031 (Pa. Super. 2006) (stating that asking of such question unquestionably falls on the side of officer safety); *Ross*, 297 A.3d at 793.

*Commonwealth v. Hawkins-Davenport*, 319 A.3d 537, 544-45 (Pa. Super. 2024).

While police officers may ask about the presence of firearms in a car stopped for a traffic violation, *Hicks* overruled our prior decision in *Commonwealth v. Robinson*, 600 A.2d 957 (Pa. Super. 1991), and held that officers may not infer criminal activity from the mere possession of a firearm. *See Hicks*, 208 A.3d at 936 ("We find no justification for the notion that a police officer may infer criminal activity merely from an individual's possession of a concealed firearm in public."). In *Hicks*, the mere possession of a firearm was the sole reason for Hicks' seizure and detainment. Police stopped Hicks' vehicle in a gas station parking lot based on information that he was in possession of a firearm. *Id.* at 922. An officer restrained his arms and removed his handgun from his holster, and a search of the vehicle followed. *Id.* While the police later determined that Hicks possessed a valid license to carry a concealed firearm, and Hicks was not later subjected to firearms related charges, he was subsequently charged with driving under the influence of alcohol, possession of a small amount of marijuana, and disorderly conduct. *Id.* Upon finding a lack of antecedent justification for the stop in

- 21 -

that case, our Supreme Court noted that Hicks' possession of a concealed firearm "alone [wa]s an insufficient basis for reasonable suspicion that criminal activity is afoot." *Id.* at 945.

Based on *Hicks*, Appellee's mere possession of the concealed firearm could not alone support reasonable suspicion justifying an investigative detention. If the only consideration at issue was mere possession of a firearm, then *Hicks* would control, as the suppression court stated at the suppression hearing. In light of our determination on the suppression court's findings of fact, the lone factor for distinguishing *Hicks* is the police officer's detection that Appellee lied to him about the presence of a firearm in the vehicle upon seeing the gun protruding from Appellee's pocket.

Here, the suppression court summarily rejected that the detected lie could have provided a basis for reasonable suspicion on the ground that lying to a police officer does not independently constitute a criminal offense: "Granted, [Appellee] was untruthful about whether he had a gun in the car; however, telling a lie while not under oath is not a crime." Suppression Court Opinion, 12/20/24, 9. Regardless of whether lying to the officer in this fashion was itself a crime, the suppression court's disregarding of the lie entirely in its reasonable suspicion analysis was clearly erroneous.

Reasonable suspicion does not require that the factors on which an officer may rely be unquestionably criminal to support further investigation. *See Commonwealth v. Davis*, 102 A.3d 996, 1000 (Pa. Super. 2014) ("the totality of the circumstances test [for determining reasonable suspicion] does

not limit our inquiry to an examination of only those facts that clearly indicate criminal conduct") (citation omitted). "Rather, even a combination of innocent facts, when taken together, may warrant further investigation by the police officer." *Id.* (citation omitted). The totality of the circumstances test for determining reasonable suspicion "is what it purports to be—it requires a *suspicion* of criminal conduct that is reasonable based upon the facts of the matter," and potential innocent explanations for a defendant's conduct may not negate a police officer's suspicion of criminal activity. *Id.* (citation omitted; emphasis in original). By disregarding Appellant's lie on the basis that it was not unquestionably criminal, the suppression court here misapplied the totality of the circumstances test and erroneously concluded there was no reasonable suspicion.[9]

Having concluded that the suppression court erred by outright disregarding Appellee's lie about the firearm in its analysis, we must next determine whether that lie supported reasonable suspicion, such that the holding in *Hicks* is distinguishable from the present facts. Appellee and the

---

[9] If the suppression court was correct, the seminal case of *Terry v. Ohio*, would have been banished to the dustbin of history on the basis that the defendant Terry and his conspirators were merely window shopping and thus their observed conduct could not support a basis for reasonable suspicion. *See Terry*, 392 U.S. at 6 (noting that, prior to the police stopping him, Terry and a conspirator took turns, between five and six times apiece, going over to the same store window, peering into the window, and returning to confer, before a conference with a third man, and subsequently resuming their "measured pacing, peering, and conferring" before the two men walked away in the same direction taken earlier by the third man).

suppression court cite our decision in *Malloy* as support for not finding reasonable suspicion based on Appellee's detected lie about the presence of a firearm in the car. *See* Appellee's Brief, 9-10; Suppression Court Opinion, 12/10/24, 6-7, 9. Our review thus turns to addressing the applicability of *Malloy*.

*Malloy* involved an instance where a police officer initiated a traffic stop of a car that appeared to lack a license plate. *Malloy*, 257 A.3d at 145. Upon approaching the vehicle, the investigating officer saw a license tag on the car's rear windshield but noticed that it was not properly displayed and secured in violation of 75 Pa.C.S. § 1332. *See Malloy*, 257 A.3d at 145. The officer asked defendant, Malloy, who was a rear passenger in the car, whether he had a firearm after Malloy produced an identification card attached to a lanyard, which the officer knew to be a common practice for armed security personnel. *See id.* Malloy informed the officer that he had a firearm on his right hip. *See id.* The officer asked Malloy to exit the car so the officer could secure the gun before continuing the investigation for the traffic stop. *See id.* The officer subsequently asked Malloy for "his documents" and Malloy produced an "Act 235" card[10] that the officer noticed was expired. *Id.* at 146 & n.1. Malloy claimed that he had another Act 235 card at home and the

_____

[10] "Act 235" is a shorthand reference to the Lethal Weapons Training Act. *See* Act No. 1974-235, P.L. 705 (Oct. 10, 1974), 22 P.S. §§ 41 to 50.1.

officer "proceeded to run checks" which determined that Malloy's Act 235 certification had expired. *Id.* at 146.

On appeal from a judgment of sentence imposed for two convictions of violating the Uniform Firearms Act, Malloy challenged the denial of his motion to suppress the firearm and his statements to the police officer. *See Malloy*, 257 A.3d at 146-47. We held that the suppression court erred by concluding that the officer's request for Malloy's documented firearms authorization could be pursued as incidental to the traffic stop. *See id.* at 152 ("We are convinced that a passenger's legal authority to own or possess a firearm is simply unrelated to a driver's authority to operate a motor vehicle, the existence of outstanding warrants against the driver, and whether a lawfully detained vehicle is properly registered or insured."). We also rejected the suggestion that the officer's request about the firearms authorization documentation "fell within the limited class of minimally intrusive and permitted demands police officers may make, out of concern for officer safety and without independent justification, during the course of a lawful traffic stop." *Id.* Put simply, the request for the documentation in *Malloy* was not related to officer safety concerns because the officer had already secured Malloy's firearm before the documentation request. *See id.* at 153 ("[O]nce Officer Henry secured the firearm, [Malloy]'s legal authority to own or possess a gun clearly bore no discernible relationship to individual safety or security within the context of the traffic stop.").

In the concluding analysis in *Malloy*, we reasoned that the officer in that case possessed no evidence showing that Malloy was involved in criminal activity, either separately or with others in the stopped car (apart from the violation warranting the traffic stop of the car in which Malloy was a passenger). *See Malloy*, 257 A.3d at 154. Principally, we noted that, based on *Hicks*, Malloy's mere possession of a firearm did not establish reasonable suspicion to allow the investigative detention of him and thereby also did not permit the request for his firearm license. *See Malloy*, 257 A.3d at 155. Because there was no reasonable suspicion to support the detention, we rejected the trial court's conclusion that reasonable suspicion could be supported by the combination of Malloy's possession of the gun and the expired Act 235 card, which was not produced until after the commencement of the detention which began based only on Malloy's mere possession of the gun. *See id.*, *citing Commonwealth v. Mackey*, 177 A.3d 221, 228 (Pa. Super. 2017) (police must have reasonable suspicion at the moment of detention; information developed after a police-citizen encounter moves from consensual to coercive cannot be used to justify the detention). Accordingly, we ruled that Malloy was entitled to suppression of the firearm and his statements to the police officer. *See Malloy*, 257 A.3d at 156.

Appellee suggests that *Malloy* "is very instructive in the instant matter." Appellee's Brief, 9. He asserts "it is … important to note that [*Malloy*] found that a defendant lying about having a valid license to carry a firearm is not enough to prove the necessary reasonable suspicion for an investigatory

- 26 -

detention." *Id.* at 10. Nevertheless, we conclude that his interpretation of *Malloy* is inapt because he misunderstands the holding of that case. We did not find that Malloy's lie to the police officer about the existence of a valid Act 235 card was insufficient support for reasonable suspicion; instead, we held that Malloy's mere possession of a firearm was inadequate to support reasonable suspicion at the initiation of an investigation detention, pursuant to *Hicks*, and thus the police were not permitted to conduct the investigative detention during which they asked for Malloy's gun authorization documentation. Accordingly, any subsequent information learned from Malloy's illegal detention, including a lie, had to be suppressed:

> At that time [(the start of the investigative detention)], the only information within Officer Henry's possession was that [Malloy] had a firearm holstered on his right hip. Under *Hicks*, that information was insufficient as a matter of law to establish reasonable suspicion. Moreover, Officer Henry's receipt of the expired Act 235 card after the start of the detention cannot be used to justify the seizure. Because Officer Henry lacked reasonable suspicion to detain [Malloy] and investigate his legal authority to carry a firearm, the detention challenged on appeal violated [Malloy's] Fourth Amendment rights and all evidence seized as a result of the investigation is subject to exclusion at trial.

*Malloy*, 257 A.3d. at 155-56 (citations omitted). Upon disregarding Appellee's lie from its reasonable suspicion analysis, the suppression court improperly adopts Appellee's incorrect reading of *Malloy* suggesting that a lie to a police officer cannot provide adequate support for reasonable suspicion. *See* Suppression Court Opinion, 12/20/24, 9 (citing *Malloy* for the holding

"finding no reasonable suspicion even where the defendant lied about having a valid license to carry a firearm").

Neither *Hicks* nor *Malloy* compels suppression in this case so long as Appellee was not subjected to an investigative detention solely based on his mere possession of a firearm. *Hicks* simply held that the mere possession of a firearm is not *alone* suggestive of criminal activity and could not independently support the finding of reasonable suspicion. *See Hicks*, 208 A.3d at 937. Properly applying *Hicks*, this Court noted, in *Malloy*, that a request for documented firearms authorization could not be pursued as incidental to a traffic stop, *see Malloy*, 257 A.3d at 152, and, instead, "any encounter undertaken to investigate an individual's firearm status" during a car stop must be treated as "an investigative detention governed by the Fourth Amendment." *Id.* at 155.

While the suppression court improperly disregarded Appellee's lie to the police officer about the presence of firearms in the car in its reasonable suspicion analysis, the Commonwealth's first issue essentially asks us to consider whether, in the totality of the circumstances, Appellee's detected lie to the police could independently support reasonable suspicion.[11] We conclude that it does.

_____

[11] In a recent unpublished memorandum, we declined to address this precise issue where the detected lie to a police officer about the absence of a firearm on a defendant's person was accompanied by additional factors supporting reasonable suspicion including that the inquiry occurred in a high crime area

*(Footnote Continued Next Page)*

In controlling case law, this Court has weighed the fact of providing false information to police officers as a factor supporting reasonable suspicion under the totality of the circumstances presented. ***See, e.g.***, ***Commonwealth v. Metz***, 332 A.3d 92, 100 (Pa. Super. 2025) (finding reasonable suspicion to extend a traffic stop to investigate Metz's involvement in illegal possession of controlled substances where, *inter alia*, Metz told the investigating officer that he was coming from gambling, which the officer knew to be a lie based upon prior surveillance); ***Commonwealth v. Williams***, 73 A.3d 609, 616 (Pa. Super. 2013) (reasonable suspicion established where, in a high crime area, Williams lied in response to a police officer's inquiry regarding what he was doing and provided the officer with a false name); ***Commonwealth v. Shelly***, 703 A.2d 499, 503 (Pa. Super. 1997) (finding that "reasonable articulable suspicion" to justify a ***Terry*** pat-down frisk was supported by, *inter alia*, the fact that Shelly lied about his identity by giving a false name to the police), ***separate holding that providing false identification is not a crime superseded by statute***, 18 Pa.C.S. § 4914.

In our recent unpublished memorandum in ***Commonwealth v. Nolan***, 2025 WL 2438383 (Pa. Super., filed Aug. 25, 2025), in the context of a case in which a defendant lied to a police officer about the presence of a firearm on

---

and the defendant engaged in unprovoked flight. ***See Commonwealth v. Nolan***, 2025 WL 2438383, *4 (Pa. Super., filed Aug. 25, 2025) ("This is not a case where we are deciding whether possessing a firearm and lying about said possession, alone, established reasonable suspicion of criminal activity").

his person, we observed, "[c]ertainly, possessing a concealed firearm and lying about that possession is suspicious." *Id.* at *4. While this observation in *Nolan* is not binding on us and *Nolan* can only be cited for persuasive value, *see* Pa.R.A.P. 126(b)(2), we adopt that sentiment here.

We observe that "tasks relating to officer safety are also part of a traffic stop's mission when done purely in an interest to protect the officers." *Ross*, 297 A.3d at 792. "This safety interest stems from the fact that traffic stops are especially fraught with danger to police officers, so an officer may need to take certain negligibly burdensome precautions in order to complete his mission safely." *Id.* at 792-93 (citations, internal quotation marks, and brackets omitted). Accordingly, officers are allowed to ask drivers or passengers whether they have a weapon or anything concerning to officer safety as a matter of course during a traffic stop. *See id.* at 793; *Clinton*, 905 A.2d at 1031 (holding that a question by police regarding the presence of a weapon during a traffic stop is constitutionally permissible, stating that such a question "unquestionably and completely falls on the side of officer safety" and "is clearly less intrusive than a request by police to exit the vehicle") (emphasis omitted).

To hold that a detected lie to a police officer in response to a question lawfully posed for the purpose of ensuring the safety of the officer would not independently support reasonable suspicion would run counter to our vast precedent preserving the officer's ability to pose questions about the presence of weapons during a car stop. As we have previously stated:

It bears emphasizing that balancing the constitutional rights of motorists, the public protection objections, and police officer safety is difficult, especially in the context of rapidly evolving traffic stops. One particular concern for officers during a traffic stop is the proliferation of guns, including the substantial increase in the number of people possessing firearms, the rise in mass shootings, and the ability to carry a concealed weapon in vehicles in Pennsylvania. Clearly, neither the United States Constitution nor the Pennsylvania Constitution require officers to gamble with their personal safety during traffic stops. Therefore, in the context of traffic stops, police officers may take reasonable precautions when the circumstances give rise to legitimate safety concerns.

*Ross*, 297 A.3d at 797-98 (citations and footnote omitted). Where a suspect – as a driver or passenger – during a lawful car stop has been caught in a lie concerning the presence of a firearm on or about their person, we find that the lie, by itself, is adequate to support reasonable suspicion permitting an investigative detention. In the context of a traffic stop, a suspect's combined acts of possessing a concealed firearm and lying about that possession provides a reasonable and articulable fact that the suspect is engaged in criminal activity because it leads to natural inferences that the defendant has lied because he wishes to hide the fact that he poses a lethal threat to the officer or to hide that his possession of the concealed firearm is illegal. *See Commonwealth v. Stilo*, 138 A.3d 33, 39 (Pa. Super. 2016) (stating that when "conducting a reasonable suspicion inquiry, a suppression court is required to afford due weight to the specific, reasonable inferences drawn from the facts in the light of the officer's experience[.]") (citation omitted). Accordingly, there was reasonable suspicion to conduct an investigative

detention of Appellee at the time the police officer saw the gun protruding from Appellee's pocket and thereby detected Appellee's lie about possession of the gun during the lawful car stop.

Having determined the existence of reasonable suspicion prior to the officer's recovery of the firearm, we must next consider, with respect to the Commonwealth's first issue, whether the recovery of the gun was the result of some improper police action or a violation of Appellee's constitutional right to be free from unreasonable search and seizure. Though Officer Irwin was clearly able to see the end of the gun, the officer proceeded to conduct a frisk of Appellee to confirm that the item he observed protruding from Appellee's pocket was, in fact, a firearm.

A police officer may conduct a frisk limited to what is necessary to discover any weapons if the officer has both reasonable suspicion that criminal activity may be afoot and reasonable belief that the subject is armed and presently dangerous. *See Commonwealth v. Taylor*, 771 A.2d 1261, 1269 (Pa. 2001). "To justify a frisk incident to an investigatory stop," the police officer must be able to point to "specific and articulable facts" indicating that the subject of the frisk "may be armed and dangerous." *Commonwealth v. Cooper*, 994 A.2d 589, 593 (Pa. Super. 2010) (emphasis omitted).

Here, we have already concluded there was reasonable suspicion to subject Appellee to an investigative detention at the moment Officer Irwin saw the gun protruding from Appellee's pocket and detected Appellee's lie about

- 32 -

its presence. Therefore, the only question as to whether the frisk was proper is whether Officer Irwin reasonably suspected that Appellee was armed and dangerous. **See Commonwealth v. Miller**, 333 A.3d 470, 477 (Pa. Super. 2025) ("[T]o proceed from a stop to a frisk, the police officer must reasonably suspect that the person is armed and dangerous.") (citation omitted). "When assessing the reasonableness of an officer's decision to frisk an individual during an investigatory detention, we are not permitted to consider an officer's unparticularized suspicion or hunch, but rather we must consider the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." **Commonwealth v. Carver**, 318 A.3d 386, 391 (Pa. Super. 2024) (citation and internal quotation marks omitted). "Further common sense concerns guide the inquiry and give preference to the safety of the police officer during an encounter with a suspect where circumstances indicate that the suspect may have, or may be reaching for, a weapon." **Id.** (citation and internal quotation marks omitted). In a circumstance where a police officer discovers that a passenger during a car stop is armed with a firearm and that same passenger lied to the officer about the presence of the firearm, common sense reasonably dictates that the passenger has exhibited the requisite dangerousness for a frisk.[12] **See Int. of T.W.**, 261 A.3d 409, 424

_____

[12] We note that our Supreme Court cautioned in **Hicks** that it "offer[ed] no opinion as to whether a police officer who has effectuated a lawful
*(Footnote Continued Next Page)*

(Pa. 2021) (*Terry* frisk was lawful even though the officer was not "absolutely certain that the object in Appellant's pocket was a weapon, rather, under the applicable standard, he need only have reasonably suspected the object to be a weapon in order to conduct a search of the pocket[.]").

When a police officer observes a firearm in plain view in a vehicle while conducting a lawful traffic stop, the officer is not required to ascertain whether the driver is illegally possessing the firearm before securing it for their protection. *See Hawkins-Davenport*, 319 A.3d at 547 (explaining that "this safety justification is applicable to a firearm regardless of the possessor's licensure status" as "[t]here is no doubt a firearm can be used to harm a police officer during a traffic stop whether it is legally possessed or not[.]"). We conclude that the same safety concerns that permit an officer to secure a firearm in plain view in a vehicle during a traffic stop are inherent in the instant case where a passenger during a traffic stop lies about the presence of a firearm and the officer sees the firearm protruding from the passenger's pocket. We find that the circumstance of Appellee's lie about the firearm justified the frisk leading to the recovery of the firearm. *See, e.g., Hawkins-Davenport*, 319 A.3d at 546 ("[T]he *Ross* Court clearly contemplated that

_____

investigative detention may treat the suspect's possession of a firearm as *per se* authorization to 'frisk' the detainee." *Hicks*, 208 A.3d at 934.

the mere presence of a firearm during a traffic stop can reasonably lead an officer to believe that his safety is at risk.").

In sum, with respect to the Commonwealth's first issue, we hold that the suppression court erred by misapplying the totality of the circumstances test for assessing reasonable suspicion by concluding that Appellee's detected lie about the presence of the firearm could not support reasonable suspicion because the lie by itself did not constitute the commission of a criminal offense. Upon properly viewing the totality of the circumstances, Appellee's lie about the presence of the firearm followed by the officer's plain view of the firearm in Appellee's pocket supported reasonable suspicion permitting an investigative detention and a frisk, resulting in the police officer's recovery of the firearm. The facts of this case present more than the mere possession of a firearm addressed in *Hicks*. In these circumstances, the police lawfully recovered Appellee's firearm without violating his rights under the Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution.

In its second issue, the Commonwealth challenges the suppression of Appellee's statement in which he admitted he did not have a firearms license, and the suppression of the firearm as the fruit of the supposed improper questioning that yielded Appellee's admission. *See* Appellant's Brief, 15-18.

When the court announced its suppression ruling, it remarked, "[the] *Hicks* case says that [the] officer should have checked before he asked the

question." N.T. Suppression Hearing, 8/21/24, 46. In its Rule 1925(a) opinion, the suppression court expanded on that reasoning, explaining that "the police improperly asked [Appellee] whether he had a firearms license without reasonable suspicion during an otherwise valid motor vehicle stop." Suppression Court Opinion, 12/20/24, 8. The court inferred that, in the absence of reasonable suspicion for an investigative detention and, with the gun secured by the police for their safety, "there was no reason for the police to inquire whether [Appellee] had a license to carry [the firearm] as this was not in any way connected to the purpose of the routine traffic stop for [an] expired registration." *Id.* at 9.

The suppression court notes that it took no issue with the fact that the police officer took possession of Appellee's gun as a matter of concern for the officer's safety: "Th[e suppression c]ourt acknowledges that under the law of this Commonwealth, the police had the lawful right to seize [Appellee's] firearm for officer safety during a motor vehicle stop." Suppression Court Opinion, 12/20/24, 10. Even though the court concluded that there was no reasonable suspicion for an investigative detention related to the firearm, the court assessed that the police officer should have researched whether Appellee had a firearms license prior to even seeing the firearm on Appellee's person: "At no time did th[e suppression c]ourt find that [Appellee] was subjected to unlawful custodial interrogation; rather, th[e c]ourt found that the police officers, who already had [Appellee's] identification, should have checked their

databases before questioning [Appellee] regarding his licensure status." *Id.* at 10-11.

The Commonwealth characterizes the suppression court's basis for suppressing Appellee's statement about his lack of a firearms license as "confusing … and, to the extent discernible, legally disjointed." Appellant's Brief, 15. It argues that there was no legal basis for the court to conclude that Appellee's statement should have been suppressed "on the supposed basis that the officers *could* theoretically have discovered [Appellee's] licensure status in a different way through their computer." *Id.* (emphasis in original). It maintains that the question posed about the licensure status was among the types of question that "are permitted by an officer in order to allay or confirm the suspicions that gave rise to the investigative detention." *Id.* at 16. Lastly, the Commonwealth asserts that, assuming *arguendo* the admission was suppressible, there was no basis for suppressing the firearm "as a tainted fruit of that statement," and Appellee's non-licensure status was inevitably discoverable. *Id.* at 17-18. We agree that the suppression court erroneously suppressed Appellee's admission and the firearm based on its flawed analysis that the investigative detention was unlawful.

In *Hawkins-Davenport*, police officers conducted a traffic stop of the defendant's car because of a non-functioning brake light during which one of the officers saw a gun laying on the front passenger's seat of the vehicle. *See Hawkins-Davenport*, 319 A.3d at 540. That officer asked Hawkins-

Davenport, "[A]nd you don't have a license for it?," before Hawkins-Davenport admitted that he did not. *Id.* at 541 & n.3. The officer then recovered the gun and proceeded to ask him a second time if he had a license to carry the gun which resulted in another response of, "No," from Hawkins-Davenport. *Id.* at 541. The suppression court suppressed the gun by determining that the police officer improperly removed the firearm from the car before ascertaining that Hawkins-Davenport did not have a license to carry the firearm. *Id.* at 542. On appeal, we determined that the removal of the gun was lawful because "police officers may, as a reasonable precaution for their safety, remove a firearm they see in plain view that is accessible by the driver, during an ongoing valid traffic stop as a matter of course." *Id.* at 546.

With respect to Hawkins-Davenport's admissions to not having a firearms license, we agreed with the Commonwealth that the statements should not have been suppressed because they were the result of a lawful traffic stop and the lawful seizure of the gun. *See Hawkins-Davenport*, 319 A.3d at 550 ("As we have already determined that the initial traffic stop and the removal of the gun were lawful, Hawkins-Davenport's statements … during that lawful traffic stop and after the officer removed the gun should not have been suppressed on the basis that they were tainted."). Similarly, here, we have determined that the stop and frisk was supported by reasonable suspicion and the police officer's seizure of Appellee's gun was lawful, thus,

*Hawkins-Davenport* dictates that there is no taint compelling suppression of Appellee's admission in this case.

In addition, and also similar to *Hawkins-Davenport*, 319 A.3d at 548, there was no issue raised here that the officer's question improperly prolonged the car stop at issue. *See* N.T. Suppression Hearing, 8/21/24, 45 (Appellee's counsel remarking, "So they could have prolonged the stop and gotten that, but they didn't," while arguing that the statement was improperly ascertained in the absence of a *Miranda* warning). To the extent that the suppression court reasoned that Appellee's admission was properly suppressed because the police officer "should have checked their databases" for Appellee's licensure status "before questioning" Appellee on that issue, Suppression Court Opinion, 12/20/24, 11, it cites no legal support for that point. Were we to agree, we would essentially be mandating all police officers in the Commonwealth run firearms licensing checks as a routine part of their car stop investigations on the off chance that evidence of improper gun possession subsequently arises, which would inevitably prolong all traffic stops. We decline to accept the suppression court's position as it directly contradicts our holding in *Malloy*, which forbids the delay of a car stop to research a passenger's firearm licensing status in the absence of reasonable suspicion. *See Malloy*, 257 A.3d at 156 ("Because Officer Henry lacked reasonable suspicion to detain [Malloy] and investigate his legal authority to carry a

firearm, … all evidence seized as a result of the investigation is subject to exclusion at trial.").

During a lawful investigative detention concerning a person's concealed possession of a firearm, i.e., a *Terry* stop supported by reasonable suspicion, there should be no impediment to a police officer quickly resolving his concerns about the detainee's lawful possession of the gun by simply asking the detainee if he has a license permitting him to carry the firearm. As a matter of statute, we already mandate that a firearms licensee "produce the license for inspection" where there is a "lawful demand of a law enforcement officer." *See* 18 Pa.C.S. § 6122(a) ("When carrying a firearm concealed on or about one's person or in a vehicle, an individual licensed to carry a firearm shall, upon lawful demand of a law enforcement officer, produce the license for inspection. Failure to produce such license either at the time of arrest or at the preliminary hearing shall create a rebuttable presumption of non[-]licensure."). That the police officers in the instant case did not independently research Appellee's licensure status in advance of the discovery of the firearm did not render improper the officer's question posed to Appellee about his licensing status. As Appellee was a passenger of his father's vehicle during the car stop, it was reasonable for the police officers to try to quickly resolve their concerns about Appellee's gun by asking the single licensing status question, which also served to limit the duration of the existing detention of

Appellee's father.[13] *See Commonwealth v. Spence*, 290 A.3d 301, 314 (Pa. Super. 2023) (noting that a police officer "may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions"), *quoting Commonwealth v. Wright*, 224 A.3d 1104, 1109 (Pa. Super. 2019).

In conclusion, the suppression court erred by misapplying the totality of the circumstances test for reasonable suspicion. The combined circumstances of Appellee indicating to the officer that there was no firearm in his father's vehicle and then the officer seeing a firearm protruding from Appellee's pocket, demonstrating that Appellee had lied to the officer about the presence of a firearm, supported reasonable suspicion permitting the officers to conduct an investigatory detention of Appellee during which they could frisk Appellee for the firearm. The removal of the gun from Appellee's pocket following the frisk was lawful. Moreover, the officers lawfully asked Appellee about his firearms licensing status during the investigative detention. The suppression court improperly suppressed the recovered firearm and Appellee's statement admitting his lack of a firearms license.

_____

[13] Because we agree with the Commonwealth that Appellee's non-licensure admission and, by extension, the firearm, were erroneously suppressed, we need not address the Commonwealth's alternative argument that suppression of the non-licensure admission would be improper because the non-licensure status would be inevitably discoverable. *See* Appellant's Brief, 18.

Order reversed. Case remanded for further proceedings. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 3/27/2026